UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

        Plaintiff,                         Case no. 8:24-cv-1459-JLB-AAS

vs.

LEGION MEDIA, LLC, et al.,

        Defendants.
_____/

**RECEIVER'S SECOND INTERIM REPORT, CONCERNING
THE AUCTION SALE AND DISPUTES WITH GARG**

MARK J. BERNET, as receiver for Legion Media, LLC, et al., files his Second Interim Report, discussing his December 6, 2024 auction sale of personal property (from which he netted $1,807,036.72 for the receivership estate) and also discussing ongoing disputes with the Defendant Garg.

I.    THE AUCTION SALE

By stipulated orders dated September 16, 2024 (doc nos. 97, 98 & 99) (collectively the "Stipulated Final Orders"), the Court among other things: (i) entered money judgments against the Defendants; (ii) converted the TRO into permanent injunctions enjoining Sloan Health Care Products, LLC ("Sloan"), Legion Media, LLC ("Legion") and the other Defendants from the same actions enjoined under the TRO; and (iii) continued the Receiver in place as receiver for the Receivership Entities and charged him with various duties. The Court's

orders also directed the Defendants Topiwala and Garg to surrender possession of various items of personal property to the Receiver for liquidation. Among the assets to be sold was a 2024 Rolls Royce Spectre, a 2022 Rolls Royce Ghost, a 2020 Lamborghini Urus, five Richard Mille watches, and various other watches and jewelry. The items are identified more completely on the auctioneer's sale catalog, a copy of which is attached as Exhibit "A."

Prior to the time the Plaintiff and the Defendants filed their motions requesting entry of the Stipulated Final Orders, Garg "loaned" the Lamborghini to a friend, who drove it from Tampa to California and then back. During the trip, the friend incurred parking tickets and toll violations in California and Las Vegas, which were reported to the receivership defendant Sloan.[1] The trip caused "road rash" to the front fenders and grill of the Urus, which negatively affected its value.[2]

Garg and Topiwala surrendered the required items to the Receiver, who then determined that a public auction would bring the best results. Under the Stipulated Final Orders, the Receiver was authorized to sell items for no less

---

[1] Garg, as the title owner of the Ghost and the Urus, listed his address with the Florida DMV as the Sloan office address. Traffic infraction notices therefore were sent to Sloan. These violations – which included fines – were reported to Garg's attorneys. The Receiver is unaware whether Garg paid them.

[2] By "road rash" the Receiver is referring to scratches, chips, and other markings on a vehicle's paintwork, caused by gravel, stones, and other debris thrown up by other vehicles on the road.

than 85 percent of their appraised fair market values; the Receiver therefore first needed to obtain appraisals.

1. <u>Appraising the Watches</u>. Many of the items of personal property to be sold were ultra high-end watches, identified as follows: [3]

- Frank Muller Style White-Brown Cintree
- Breitling Stainless Steel Chronograph Chronomat Evolution
- Rolex Stainless & Gold Submariner, Blue Dial Bezel
- Rolex Everose Gold Cosmograph Daytona 40
- Richard Mille RM67-02 Sebastien Ogier
- Richard Mille RM011 RG/TI AO Felipe Massa
- Richard Mille RM21-02 Aerodyne
- Richard Mille RM055 Bubba Watson
- Richard Mille RM07-01 NTPT
- Patek Phillippe Nautilus Travel Time
- Rolex Yellow Gold Yacht Master II
- Rolex Yellow Gold Datejust Pearlmaster 34

---

[3] Garg was directed to surrender a specified list of watches and jewelry he identified on his sworn financial statement (he had purchased all of them using funds derived from Sloan). He delivered the items on the list, and then discovered that he had failed to include one additional Rolex on is sworn financial statement. He eventually surrendered that watch as well. Additionally, he surrendered 14K gold links from a watch band that did not match any of the watches he surrendered, causing the Receiver to suspect that he has, or had, another watch that he did not identify on his sworn financial statement.

- Ernst Benz Chronosport Limited[4]

To obtain appraisals of the watches, the Receiver hired Grant Johnston of Johnston Jewelers. Mr. Johnston advised that he would prepare appraisals for all of the watches except for the five Richard Milles; because of their uniqueness, he recommended that the Receiver hire Sean McLaren of TPT Timepiece Trading in Miami, an expert on RMs, to prepare appraisals.[5] The Receiver arranged for the appraisers to review the watches in his office.[6] Copies of the appraisals are attached as Exhibit "B." Of note is that (i) all of the RMs were authentic, although the certificate of sale/authenticity for one was not genuine; (ii) the RMs all showed a slightly unusual amount of wear-and-tear;[7] and (iii) some of the non-RM watches did not have original paperwork or boxes. Also, the watchbands were sized to fit Topiwala and Garg, both of whom have small wrists. While re-sizing the bands is possible, the need to do so impacted the salability of the watches.

---

[4] The Receiver also included in the auction two other luxury watches recovered in a different receivership estate.

[5] Richard Mille is a Swiss luxury watch company founded in 2001 by Dominique Guenat and Richard Mille in Les Breuleux, Switzerland. Richard Mille specializes in high-priced clockwork watches, ranging in price from $60,000 to well over $1 million. Timepiece Trading is a leading luxury watch retailer specializing in the sale of high-end timepieces from some of the world's most renowned brands, including in particular Richard Mille.

[6] The Receiver knew that the watches had an aggregate value well in excess of $1 million. For that reason, he was reluctant to take them outside of his secure location.

[7] Many RM owners who are true horologists acquire, in addition to their genuine RM, a "super clone" that to all outward appearances looks genuine. *See, e.g., https://superclonewatches.is/product-category/super-clone-richard-mille/*. This allows the genuine RM to be kept safely stored. Garg and Topiwala did not follow this practice, according to their sworn financial statements.

   2. <u>Appraising the Vehicles</u>.  The vehicles – a 2024 Rolls Royce Spectre, a 2022 Rolls Royce Ghost, and a 2020 Lamborghini Urus – also were high-end and required an appraiser with special, specific expertise.  The Receiver hired Zen Motorsports to prepare written appraisals,[8] copies of which are attached as Exhibit "C."  Of note:

- The Spectre is an electric vehicle, with the 2024 model the first manufactured by Rolls Royce.  This particular vehicle was chartreuse, an unusual color that mildly degraded from its value.  It had 583 miles.  The Spectre was not subject to any lien.[9]

- The Ghost had 8,797 miles.  The appraisal noted reasonably minor paint and body damage to the front bumper, as well as a scuff on the driver's side front tire.  The vehicle was subject to a lien in favor of SSB Bank in the amount of $258,211.89.

- The Urus had been driven from Tampa to California and back immediately before it was delivered to the Receiver.  The vehicle, which had 18,158 miles, had paint and body damage from the trip, curb damage to

---

[8] Zen Motorsports is a licensed, bonded boutique automotive dealership that buys and sells high-end automobiles, such as Rolls Royces and Lamborghinis.

[9] Garg purchased the Spectre from a Miami dealership.  He paid for it using an unsecured line of credit obtained from SSB Bank in Pittsburgh.  The Receivership Entity Sloan Health Care Products made payments, on Garg's behalf, on the SSB line of credit.  Sloan specifically reserves all rights to seek recovery from Garg of the amounts it paid on the line of credit.

two of the tires, and stains on the seats. The vehicle was subject to a lien in favor of SSB Bank to secure a balance owed of $190,891.91.

        3.      <u>Marketing</u>. The Receiver hired John Harris and Harris Auctions LLC to market and conduct a public auction sale of the personal property.[10] Mr. Harris selected the Hilton Downtown Tampa as the auction location because it offered an outdoor terrace to display the vehicles, along with an adjacent inside conference room for the watches and jewelry. The hotel also was within walking distance of the vault where the Receiver stored the watches, and only six miles from where the vehicles were stored.

The auctioneer created a 26-page paper color catalog brochure, used for personal marketing, and an electronic version for internet marketing. *See* Exhibit "A." The auctioneer then implemented a focused, narrow marketing campaign:

- The catalog was the template for auctioneer's webpage, along with a listing on AuctionZip (an online auction marketing service).

---

[10] Mr. Harris, a licensed auctioneer, has auctioned tens of millions of dollars' worth of real and personal property for the Receiver over the past 20+ years. For the Receiver, Mr. Haris has sold dozens of high-end watches and automobiles, as well as commercial property, houses, condominiums, jewelry, construction equipment, and boats and yachts (among other things). Because of his relationship with the Receiver, Mr. Harris charges a total of ten percent of the purchase price as his commission, split equally between the Receiver and the buyer. By contrast, Christie's Auction House charges in excess of 20 percent as a commission.

- The auctioneer contracted with Live Auctioneers as the online bidding platform. The auctioneer chose Live Auctioneers because it specializes in selling luxury items, and also markets to its former purchasers with e-mail marketing materials.

- High-end watches and vehicles generally are purchased by dealerships and brokers, because end users rely on industry experts to locate such items and advise on condition, availability, and desirability. The auctioneer therefore targeted luxury automobile and watch dealers with his marketing campaign. This involved direct personal and telephone contact, beginning approximately four weeks prior to the sale.

- The target market included brokers and dealers in the Middle East and Europe. The auctioneer noted interest from Dubai and South Africa (there was little interest from brokers and dealers in Paris or Switzerland). There was curious, polite interest in the watches in the United Kingdom. There was little to no interest overseas in the vehicles, principally because of shipping expenses and duties.

- Domestically, the auctioneer received significant interest in the watches from dealers and brokers in New York City, including several whom the auctioneer had not contacted. Most of the

interest came from brokers and dealers in California, New York, Texas and Miami, both for the watches and the vehicles.

- A week before the sale the auctioneer traveled to Miami to visit The Seybold® Jewelry Building and surrounding businesses to market the watches.[11] Most of the brokers and dealers located there already knew about the sale. Several brokers and dealers requested proxy phone bidders to appear for them at the auction.

- Finally, the auctioneer provided two e-mail blasts to over 10,000 followers, ten days in advance of the auction and three days in advance.

Additionally, the Receiver personally marketed the auction through his social media cites, including LinkedIn, Instagram and Facebook accounts. This generated approximately 20 telephone calls and/or e-mails from individuals interested in the items to be sold.

4. <u>Results</u>. On the day of the auction, 33 individuals registered to appear personally. Two additional bidders were present through proxy

---

[11] Located in downtown Miami, the 166,000 sq. ft. historic building is the second largest diamond and jewelry center in the country. Officially on the National Register of Historic Places, this vertical shopping center houses over 300 jewelers on ten floors. The building includes a broad range of retail and wholesale jewelry and watch businesses.

telephone bidders. Over 300 individuals, from five foreign countries, registered online and placed a bid on one or more of the items.[12]

Under the Stipulated Final Orders, the Receiver was not authorized to accept less than 85 percent of an item's fair market value. Of the 19 items offered for sale, 18 generated bids that exceeded the minimum required amounts. The only item that did not meet the minimum price was a white gold man's chain containing 136 round brilliant-cut diamonds (24.5 ct) with a custom 2-sided dog tag pendant featuring a colored diamond Jamaican Flag design on one side and 188 emerald-cut diamonds (24.2 ct) on the other. The reserve price for this unique item was $26,000, which was not received.

Sixteen of the 18 buyers paid promptly. The buyer of the Rolls Royce Ghost did not pay by the December 9, 2024 deadline, citing "paperwork issues," although the Receiver suspects that the delay was an effort to persuade the Receiver to reduce the agreed price. The buyer ultimately paid the bid amount. The buyer of the Breitling stainless steel chronograph watch did not pay by the deadline, but instead paid on December 31, 2024.

From the 16 items that were sold and paid for prior to December 31, 2024, the Receiver received the gross amount of $2,308,000.00. The

---

[12] Prior to the auction online bidders were permitted to place their "maximum bid" with Live Auction, the online bidding service. Live Auction then automatically chose and displayed the highest bid on its website, so that other bidders could choose whether to make a better offer. Live bids at the auction were posted online, so that the online bidders were able to participate and make a better bid. Ultimately two items were sold online.

auctioneer's five percent commission totaled $115,410.00,[13] and he also incurred $4,803.28 in reimbursable expenses. The net paid to the Receiver for the 16 items therefore was $2,187,786.72. Additionally, the RR Ghost and the Lamborghini Urus were subject to liens in favor of SSB Bank, which agreed to accept $380,950.00 to release its liens.[14] The net recovery to the receivership estate therefore is $1,807,036.72:

| | | |
|---|---|---|
| Gross Sale Proceeds | | $2,308,200.00 |
| Auctioneer's commission | $115,410.00 | |
| Auctioneer's Expenses | $4,803.28 | |
| Negotiated Lien Payoff (SSB) | $380,950.00 | |
| Total Expenses | $501,163.28163.28 | |
| Net Payment Received | | $1,807,036.72 |

Additionally, the Receiver will need to liquidate the men's chain/Jamaican flag dog tag.

    II.    <u>ONGOING ISSUES WITH GARG</u>.

The Defendant Garg has continued to take steps to frustrate the Receiver's efforts to prepare the Receivership Entities Sloan Health Products,

---

[13] Again, the auctioneer charged the Receiver a sales commission of five percent of the sale price. The auctioneer also charged the buyer a 5 percent buyer's premium. The auctioneer's total payment therefore amounted to ten percent of the sale price.

[14] The actual amount of the liens was $449,103.80, but the Receiver convinced SSB to proceed with a short sale.

F & B Cosmetics and H & M Distribution for sale. Most recently, he changed the password on the companies' American Express accounts and then instructed American Express to have no contact with the companies, effectively locking them out of the account. The Receiver believes that Garg did this in retaliation for the companies' decision to use approximately 15 million points that had accumulated on the account to pay a balance of approximately $150,000 owed to American Express for business expenses in early November.[15] Being unable to use the American Express account has caused unnecessary distractions to the companies.

As reported above, Garg "loaned" his Lamborghini to a friend immediately prior to the time he was to surrender possession. The 'friend' put an estimated 5,000 miles on the vehicle through a trip to California and back, and also caused the vehicle to incur paint damage. The extra mileage and cosmetic paint damage detracted from the value of the vehicle. Garg also stopped making payments to the vehicle's lienholder, SSB Bank, prompting SSB to look to the companies for payment. Garg also refused to pay for insurance for his vehicles, thereby forcing the companies to do so.

---

[15] Garg maintains he did not lock the companies out of the American Express accounts. In point of fact, he changed the password for online access on several occasions. Sloan's CFO, who remained as an administrator on the account, was able to regain access until November 26, 2024, when Garg not only changed the password but also removed her administrative privileges.

During the summer of 2024 Garg insisted that the companies make payments on condominiums titled in his name and located in Miami, based on an initial assertion that he would surrender the units to the receivership estate. Garg subsequently changed his mind, but not until after the companies made several payments on the unit's mortgages and for insurance and other expenses. Garg also insisted that the companies make mortgage, insurance and other payments for a house he owns, in his name, on Evelyn Street in Tampa, based on a similar representation that he would surrender it to the receivership estate.[16] Garg now refuses to surrender the properties, or even refund the post-receivership payments.

Garg and the Defendant Topiwala were 50-50 owners of a Florida limited liability company called Shilin Investments, LLC, which they used in late 2023 and early 2024 to pay approximately $1.5 million to a Miami condominium developer under a condominium presale contract. The money derived from Sloan Health Products (Garg's half) and Legion Media, LLC (Topiwala's half), neither of which received anything in return for transferring the money. Topiwala has agreed that his interest in Shilin belongs to the

---

[16] From 2020 through the Receiver's appointment in June 2024, Garg directed Sloan to pay $532,583.17 for mortgage payments and various other expenses associated with the Miami condominium unit. In 2023 through the Receiver's appointment in June 2024, Garg directed Sloan to pay $991,649.86 for mortgage payments and various other expenses associated with the house on Evelyn Street in Tampa. Sloan received nothing in return for these payments. Garg has refused any discussions with the Receiver concerning these transfers unless the Receiver first "proves" his claims to Garg's attorneys.

receivership estate, but Garg maintains that his interest should remain with him. The Receiver has filed a lawsuit against the developer and against Shilin to avoid the fraudulent transfer of the $1.5 million; Garg's attorneys have advised that they will represent Shilin and that they intend to resist the lawsuit.

Garg personally also is a party to other condominium presale agreements, summarized on the following chart:

| PROJECT | DATE | DEPOSITS PAID |
|---|---|---|
| One Tampa, Tampa Florida | 03-24-2023 | $1,245.715.00 |
| E11even™ Residences Beyond Miami Florida | 09-18-2023 | $975,000.00 |
| West Eleventh Residences Miami Florida | 04-22-2024 | $109,658.50 |

The deposits, totaling $2,330,373.50,[17] derived mainly from Sloan, although Sloan received nothing in return for making the payments. The contracts therefore should be property of the receivership estate under a constructive trust, but Garg refuses to turn over possession, insisting instead that the Receiver first "prove" his case to Garg's satisfaction. The Receiver would prefer to avoid initiating costly litigation, but may have no other choice so long as Garg refuses to engage in any settlement discussions.[18]

---

[17] Again, this includes payment for two watches that belong to a different receivership estate.
[18] Among other things, Garg has argued that the receivership is to expire in early January and that he will oppose any extension to be certain that the Receiver will not be able to file a lawsuit.

Prior to the Receiver's appointment, and apart from the money transferred in connection with the condominium presale agreements, Sloan transferred several million dollars directly to Garg, or to third parties on Garg's behalf. Sloan received nothing in return; in fact, Garg directed that many of the expenditures, including expenditures for furnishings for his houses, be deducted as business expenses.[19] Apart from the questionable tax treatment of the expenditures, Sloan's transfers to Garg likely would not have been problematic had Sloan generated the money legitimately. However, as has been reported, Sloan obtained 50 percent, or more, of its revenues by selling products it manufactured to the Receivership Entities KP Commerce, Pinnacle Payments, Legion Media, Black Window Group and Larchwood Distribution, all of which utilized an unlawful "negative option" business practice to defraud consumers of over $300 million. The money that Garg took from Sloan should be repaid, but Garg has refused any substantive discussion, claiming instead that they need proof that Garg received transfers from Sloan.[20]

---

[19] The questionable business deductions appear on the 2022 federal tax returns, which were filed prior to the Receiver's appointment. Garg now maintains that many of the same expenditures in 2023 should be determined to be taxable distributions to him; the Receiver, who is the sole person with authority to make that decision (*see* 26 U.S.C. §6012(b)(3)), has not yet determined how to handle this issue.

[20] Garg maintains that his settlement with the FTC precludes the receivership estate from pursuing claims against him. However, nothing in the Court's Stipulated Final Orders forecloses Sloan's claims against Garg for improper payments; such claims are independent of the FTC's claims for violations of consumer protection statutes and regulations.

Most troublingly, Garg and his ex-spouse, Patricia "Trish" Ohab, have conspired to compete with Sloan and F & B by stealing their customers.[21] Specifically, in September 2024, while Ohab was still employed by Sloan, she created a company in Ontario, Canada called Toro Natural Labs, Ltd. Ohab and Garg have since utilized Toro Natural Labs as a broker, or middleman, to attempt to shift business from at least one of Sloan's customers to a competitor affiliated with Garg, called Pharma Natural Health Solutions located in Miami. Ohab's involvement with soliciting customers from Sloan is a direct violation of her Non-Compete/Non-Disclosure Agreement. The Receiver is contemplating litigation to enjoin this conduct.

III. CONCLUSION

The Receiver invites the questions and comments of the Court and the parties.

/s/ Mark J. Bernet
Mark J. Bernet, Receiver
Florida Bar No. 606359
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
T: (813) 223-7333
F: (813) 223-2837
E-mail: mark.bernet@akerman.com
Secondary: caren.deruiter@akerman.com
Secondary: sal.papsidero@akerman.com

---

[21] Ohab, who resides in Canada, was the Director of Purchasing for F & B and Sloan as of the Receiver's appointment. Due to poor performance and an uncooperative attitude, the Receiver terminated her role with the company.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served by CM/ECF and via e-mail to Darren Lubetzky, Esquire, e-mail dlubetzky@ftc.gov, Vikram Jagadish, Esquire, e-mail vjagadish@ftc.gov, and via e-mail to Stephen R. Freeland, Esquire, sfreeland@grsm.com; Jim Felman, Esquire**, e-mail** JFelman@kmf-law.com; Michael Carey, Esquire, mcarey@careyomalley.com; Eric Forni, Esquire**,** e-mail Eric.forni@us.dlapiper.com; David Stier, Esquire**, e-mail** David.Stier@us.dlapiper.com **and** Eric S. Rosen, Esquire**,** e-mail erosen@dynamisllp.com, this 2nd day of January, 2025.

*/s/ Mark J. Bernet*
Mark J. Bernet, Receiver