UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

               Plaintiff,                   Case no. 8:24-cv-1459-JLB-AAS

vs.

LEGION MEDIA, LLC, et al.,

               Defendants.

_____/

## RECEIVER'S MOTION TO EXTEND RECEIVERSHIP AND CONFIRM RECEIVERSHIP AUTHORITY

MARK J. BERNET, as receiver for Legion Media, LLC, et al., moves for entry of an order extending the term of the receivership, for an additional six months, subject to possible further extensions for good cause. The Receiver further moves for an order confirming that the Receiver's authority remains as expressed in the Court's June 18, 2024 Temporary Restraining Order. **The FTC and the Defendants Topiwala and Patel do not oppose the motion. The Defendant Garg opposes the motion**.

In support of this motion the Receiver submits the accompanying memorandum.

## PRELIMINARY STATEMENT

In its orders approving the settlement reached by the parties, the Court directed the Receiver to accomplish certain tasks within 120 days, subject to possible extensions for good cause. The Receiver has finished most of his tasks but some – including cleaning up companies and preparing them to be sold as going concerns – require additional time to finish.

The Receiver further requests that the Court clarify that the powers confirmed upon him in the TRO remain in place. It is obvious that they should, as the Receiver is still utilizing most of those powers without objection and needs them to accomplish his court-ordered tasks. However, some of the Defendants who are potential targets of claims by the Receiver are seeking to short-circuit the Receiver's powers, in an effort to insulate themselves. The Court should not permit this.

I.    PROCEDURAL BACKGROUND

The Federal Trade Commission filed its Complaint (doc. no. 1) on June 17, 2024, against Defendants Harshil Topiwala, Manindra "Manin" Garg and Kirtan "Kits" Patel (the "Individual Defendants"), as well as Defendants Legion Media, LLC, KP Commerce, LLC, Pinnacle Payments, LLC and Sloan Health Products, LLC (together the "Company Defendants"), alleging that the

Defendants operated as a "common enterprise" to commit violations of various provisions of federal law, including:

- Section 5 of the FTC Act, prohibiting unfair or deceptive acts or practices in or affecting commerce;

- Sections 3 and 4 of the Restore Online Shoppers' Confidence Act (ROSCA), prohibiting merchants from charging consumers for goods or services sold in internet transactions through a "negative option" feature absent specific material disclosures and consumers' express consent; and

- The Electronic Fund Transfer Act and associated Regulation E, prohibiting preauthorized transfers of funds from consumers' accounts without consumers' express written authorization.

The Court's June 18, 2024 Temporary Restraining Order (doc. no. 17) among other things enjoined the Defendants from violating the statutes and rules listed above.  The TRO also appointed Mark J. Bernet as a Temporary Receiver to take control of the Company Defendants to examine their business practices and suspend their business operations unless he determined they could be operated legally and profitably.  TRO, Section XIV.T (p. 25).

The Court's TRO defined the term "Receivership Entities" as the Company Defendants (Legion, KP, Pinnacle and Sloan)

> as well as any other entity that has conducted any business related to Defendants' marketing or sale of products with a Negative Option Feature, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant.

Under this definition, the Receiver determined that the non-parties Black Window Group, LLC, F & B Cosmetics, LLC, Face and Body, LLC, H & M Distribution, LLC, HK Distribution, LLC, and Larchwood Distribution, LLC all were "Receivership Entities." In July and August, 2024, the Receiver gave appropriate notices that he had declared each a "Receivership Entity," *see* TRO, Section XV.U (p. 25). There have been no challenges to his declaration.

By its orders dated June 28, July 15, August 5, and September 9, 2024 (doc. nos. 28, 63, 77 & 94), the Court extended the TRO. Thereafter, by stipulated orders dated September 16, 2024 (doc. nos. 97, 98 & 99) (collectively the "Stipulated Final Orders"), the Court among other things: (i) entered money judgments against the Defendants; (ii) converted the TRO into permanent injunctions enjoining the Defendants from essentially the same actions enjoined under the TRO; and (iii) continued the Receiver in place as receiver for the Receivership Entities and charged him with various duties.

The Stipulated Final Orders contemplated that the receivership might conclude within 120 days, or by January 14, 2025. *See e.g. Stipulated Order for Permanent Injunction, Monetary Judgment and other Relief as to Harshil Topiwala, Legion Media, LLC and Pinnacle Payments, LLC* (doc. no. 97), Section XIV (p. 26). However, the Stipulated Final Orders also provided that the receivership could be extended beyond 120 days for good cause. *Id.*

II.   <u>RECEIVERSHIP STATUS</u>

Upon the entry of the Stipulated Final Orders the Receiver proceeded as instructed therein.  The Receiver has:

- Collected cryptocurrencies from accounts controlled by Topiwala and Patel and liquidated them, realizing $1,487,280 transferred to the FTC.

- Collected monies held by financial institutions and brokerage firms in pre-receivership accounts.

- Conducted a public auction of various items of personal property, including a number of high-end watches, two Rolls Royce automobiles, and a Lamborghini.  *See Receiver's Second Interim Report, Concerning the Auction Sale and Disputes with Garg* (doc. no. 111).

- With Court approval, hired a management consultant to assist with preparing the Receivership Entities Sloan, F & B Cosmetics and H & M Distribution for sale.  *See Endorsed Order Granting Motion to Authorize the Receiver to Employ Scott Van Meter and HKA Global Consultants as Management Consultants* (doc. no. 104).  This was necessary because, for the Receiver to sell the three companies, they require significant accounting, structural and operational "repairs" before they can become marketable.

- Obtained the return of $100,000 from Habana Ambulatory Surgery Center.  Garg directed Sloan to invest that amount in a surgery center prior to the Receiver's appointment.   Garg personally claimed partial

ownership of the company that purchased the surgery center, but because the funds derived from Sloan, the Receiver demanded, and obtained, their return from Garg's business partner.

- Terminated the employment of approximately ten workers who were undocumented aliens, or who were unable to provide appropriate documentation to support their right to employment. *See* 8 U.S.C. §1324a.[1]

- Negotiated an agreement with a credit card payment processor relating to credit card reserves owned by the Receivership Entities. The settlement agreement is in the final drafting phases. *See* Section III below.

- Negotiated an extension/renewal of matured equipment loans. *See* Section III below.

- Filed a lawsuit against 11th Street Condo Owner II, LLC and Shilin Investments, LLC, seeking to recover in excess of $1.5 million in deposits transferred to a condominium developer under condominium presale

---

[1] In 2020 Face and Body, LLC, the predecessor to F & B, received notification from the Social Security Administration that 153 of Face and Body's 219 workers reported social security numbers that did not match their names. Face and Body requested documentation from the workers, but many were unable to provide it. By August 2021, Face and Body still employed approximately ten workers who could not provide documentation. To keep those workers, Garg directed that they be taken off of Face and Body's payroll, which was provided by a payroll processing company, and instead be paid by H & M directly. The workers were never able to provide documentation to match the information provided on their I-9 forms, but because H & M had fewer than 35 workers, there were no reporting requirements. Attorneys Dilip Patel and Yova Borovska of the Buchanan Ingersoll firm, in Tampa, reportedly advised Garg that he would not be caught employing undocumented workers if he followed this practice. Under 8 U.S.C. §1324a(f), any person or entity that engages in a pattern or practice of hiring or employing undocumented aliens can be fined up to $3000 for each unauthorized worker, imprisoned for up to six months of the entire pattern or practice, or both.

agreements.[2]  The deposits derived from Sloan and the Receivership Entity Legion Media, LLC, but neither received any benefit in return.  Shilin, technically the "buyer" under the condominium presale agreements, is owned 50-50 by Topiwala and Garg.

III.    OPEN ITEMS

The following items remain open:

A.    Selling Sloan, F & B and H & M.

The Receiver chose to continue to operate three of the Receivership Entities – Sloan, F & B and H & M – because he concluded that, with behavioral modifications, they could operate "legally and profitably."  *See Receiver's Initial Report* (doc. no. 87), Section II.H (p. 18).  The Receiver's objective, which has been communicated to counsel for all parties for the past several months, was and remains to prepare the companies to be sold as going concerns.  No parties have ever raised any objection.

The Receiver's current plan is to have the companies ready to be placed with a business broker or investment banker by the end of the first

---

[2] Under Florida law condominium developers are authorized to sell condominium units that are not yet built under presale agreements.  The Florida legislature routinely amends the applicable statutes, but generally they provide that a developer can sell an unbuilt condominium unit by charging a purchase price and collecting up to 25 percent of that price as a deposit in advance of construction.  Condominium presale agreements allow interested purchasers a "leg up" in obtaining units in highly desirable areas, such as Miami Beach.

quarter of 2025, with the goal of finding a buyer, and closing on a sale, by the end of the third quarter.

The companies were poorly organized and haphazardly operated, and so preparing them for sale has required, and will require, a significant investment of time and resources. Among other things:

- The companies were not operating "legally" as of the commencement of the receivership. Sloan and F & B were selling a significant amount of the products they manufactured to other Receivership Entities, which in turn sold them online to consumers in business-to-consumer, or B2C, sales using unlawful sales tactics.[3] Sloan in particular generated approximately half its revenues through sales to the Topiwala-controlled Receivership Entities Pinnacle Payments, LLC, KP Commerce, LLC, Black Window Group, LLC and Larchwood Distribution, LLC (collectively the "B2C Receivership Entities").[4]

The Receiver halted the B2C sales to the B2C Receivership Entities. This necessarily reduced the revenues that Sloan and F & B generated. It also reduced the revenues that H & M generated, because

---

[3] Garg, the owner of Sloan and F & B and the half-owner of H & M, knew this but proceeded because the unlawful tactics generated revenue for Sloan. Garg also received money directly from the B2C Receivership Entities under a profit participation agreement. Garg, a convicted felon (*see United States v. Garg*, case no. 1:14-cr-000006-JPJ, United States District Court, Western District of Virginia) also participated, with others, in "credit card laundering" and "load management" activities. *See Receiver's Initial Report*, Sections II.B, III.D.

[4] Larchwood Distribution is owned 50-50 by Topiwala and Garg.

H & M was the fulfillment company that picked, packed and shipped products to consumers who bought product from the B2C Receivership Entities. The Receiver has focused on cost-cutting and generating new revenue sources, principally from increased business-to-business (B2B) sales of product.

- The Receiver determined that the existing CFO was handling far more than reasonably could be expected. He therefore hired a Controller, who began his employment on January 8, 2025. The Controller will supervise the accounting staff, prepare monthly reports and conduct a forensic review of the companies' financial performance, all of which will be necessary when the companies are actually listed for sale.[5] The existing CFO will remain with the companies and retain her title, and focus on supervising the sales and production departments.

- Selling the Sloan Receivership Companies, or their assets, necessarily will require the Receiver to demonstrate to potential purchasers the companies' revenues and expenditures. This, however, will require accounting adjustments and procedures because, prior to this lawsuit the companies intermingled their business operations. For

---

[5] As an example, when the Receiver asked the CFO for a breakdown on the costs associated with manufacturing product for a particular order so that he could determine whether the pricing for the product was appropriate, he discovered that there was no system in place for tracking costs. Instead, the companies' management "guessed" at overhead figures that they included in the price calculation. For the companies to be sold, guesswork will be insufficient.

example, Sloan, F & B and H & M all operate out of a 110,000 sq. ft. manufacturing facility located in Smyrna, Tennessee, but the factory is leased solely in the name of Sloan, and neither F & B nor H & M have any formal responsibility to contribute to the $100,000/month rent. Equipment utilized by all three companies is owned by Sloan, but Sloan alone is liable on approximately $3.2 million in equipment loans. Similarly, the three companies share accounting and senior management staff, both in Tampa and Smyrna, with no formal agreement to allocate the expense. There are options on how these, and other, corporate governance matters could be addressed, but each could have tax, operational or other consequences.

To address these issues, the Receiver hired a part time management consultant who is assisting on these projects, and who also is responsible for working with the new controller to create accurate, complete financials for the companies, which are essential in determining a value and marketing them for sale.

- The equipment used to manufacture products for both F & B and Sloan is owned by Sloan and is subject to a security interest in favor of PNC Bank to secure loans in the approximate amount of $3.2 million. The equipment loans, for which only Sloan is liable, matured on September 30, 2024. The Receiver negotiated a modification and

extension of the loans, although it has not yet been fully documented.  As is customary, the Bank is preparing the loan documents.

- F & B holds an NSF certification and recently completed an annual review to maintain its certification, which it passed.  NSF International, formerly known as the National Sanitation Foundation, is an independent organization that provides certification services to the nutritional supplements, cosmetics, and many other business sectors. The primary role of NSF is to ensure that products meet strict standards of safety, quality, and performance.  NSF certification is a mark of quality that assures consumers that a product or system meets certain standards for public health and safety.  NSF certification is not required by law, but is rapidly becoming a "must have" in the nutritional supplements and cosmetics industries.

Sloan presently does not hold an NSF certification.  At one time prior to the receivership Sloan looked into obtaining NSF certification, but Garg chose not to proceed.  To obtain NSF certification now Sloan will need to acquire and install certain new equipment and modify its facility and, to a lesser extent, its manufacturing processes.

The Receiver has directed Sloan to be prepared to seek an NSF inspection by March 31, 2025.[6]

Adding an NSF Certification to Sloan will make the company more valuable and more marketable.

B.    <u>Liquidating Michael Jordan Sports Memorabilia</u>.

Under Section IX.F (p. 20) of the Court's September 16, 2024 *Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief as to Harshil Topiwala, Legion Media, LLC and Pinnacle Payments, LLC* (doc. no. 97) (the "Topiwala Judgment"), Topiwala was directed to surrender to the Receiver unencumbered title to and complete ownership interest in a Michael Jordan Game Used 1998 Eastern Conference Semi Finals Jersey and Shorts, Game Matched for May 8, 1998.  Topiwala complied with the order, and the Receiver chose to store the memorabilia in a vault under the control of Fanatics, a sports memorabilia broker and seller.  Fanatics, which sold the memorabilia to Topiwala in the spring of 2024 for $1,350,000, has advised that it would sell the item at auction, but that it will not do a "reserve" auction, under which the product would have to sell for a minimum price.[7]  The Court's

---

[6] Some of Sloan's customers presently require NSF certification.  Sloan therefore outsources some of its manufacturing to other companies with the certification.  When it obtains its own NSF certification, Sloan will be able to manufacture for these customers in-house, which will improve its profitability.

[7] A "reserve" auction is in contrast to an "absolute" auction, under which items will be sold to the highest bidder regardless of price.  As a general rule, the Receiver prefers absolute auctions because, without a minimum price established, potential buyers are more likely to

order requires that the memorabilia be sold for no less than 85 percent of its appraised value; this necessarily would require a "reserve" auction. The Receiver presently is interviewing other auction houses.

C.     <u>Credit Card Reserves</u>.

Section IX.D.6 of the Topiwala Judgment (p. 20) directed Pathward, National Association to deliver to the Receiver all assets from credit card reserve accounts held in the name of, or for the benefit of, the Receivership Entities Black Window, KP, Larchwood and Pinnacle. Pathward, however, is not a party in the lawsuit and objected that it was not bound by the Topiwala Judgment and had other defenses. On the other hand, Pathward was and remains cooperative, and in that spirit the Receiver negotiated a settlement under which Pathward agreed to turn over the bulk of the credit card reserves. The settlement, under which the Receivership estate would receive approximately $3 million, is in the documentation stage and will be presented to the Court for approval when completed.

---

attend and participate hoping they can get a good deal. By contrast, under a "reserve" auction, buyers may not want to attend or participate if the reserve price is established at a level that would not amount to a good deal.

C.    Litigation.

The Receiver is reluctant to initiate litigation on behalf of the Receivership Entities unless doing so is absolutely necessary.  Unfortunately, certain matters have required litigation, and other matters may require the Receiver to file separate lawsuits.  Specifically:

- The Receiver's lawsuit against a condominium developer and a Garg/Topiwala entity is styled *Sloan Health Products, LLC, etc. v. 11th Street Condo Owner II, LLC, et al.*, case no. 8:24-cv-2572, United States District Court, Middle District of Florida.  Garg and the Defendant Topiwala were 50-50 owners of a Florida limited liability company called Shilin Investments, LLC which, in late 2023 and early 2024 paid more than $1.5 million to a Miami condominium developer under a condominium presale contract.  The money derived from Sloan (Garg's half) and Legion Media, LLC (Topiwala's half), neither of which received anything in return.  The Receiver's lawsuit against the developer and Shilin seeks to avoid the fraudulent transfer of the $1.5 million; Garg's attorneys represent Shilin (possibly without Topiwala's consent) and are resisting the lawsuit.

- During the summer of 2024 Garg insisted that Sloan make payments on condominiums titled in his name and located in Miami, based on an initial assertion that he would surrender the units

to the receivership estate. Garg subsequently changed his mind, but not until after the companies made several payments on the unit's mortgages and for insurance and other expenses. Garg also insisted that the companies make mortgage, insurance and other payments for a house he owns, in his name, on Evelyn Street in Tampa, based on a similar representation that he would surrender it to the receivership estate.[8]  Garg now refuses to surrender the properties, or even refund the post-receivership payments.  The Receiver will need to file a lawsuit against Garg if he will not return the money or engage in good-faith discussions (so far he refuses).

• Garg personally also is a party to other condominium presale agreements, summarized on the following chart:

| PROJECT | DATE | DEPOSITS |
| --- | --- | --- |
| One Tampa, Tampa Florida | 03-24-2023 | $1,245.715.00 |
| E11even™ Residences Beyond Miami Florida | 09-18-2023 | $975,000.00 |
| West Eleventh Residences Miami Florida | 04-22-2024 | $109,658.50 |

---

[8] From 2020 through the Receiver's appointment in June 2024, Garg directed Sloan to pay $532,583.17 for mortgage payments and various other expenses associated with the Miami condominium unit.  In 2023 through the Receiver's appointment in June 2024, Garg directed Sloan to pay $991,649.86 for mortgage payments and various other expenses associated with the house on Evelyn Street in Tampa.  Sloan received nothing in return for these payments. Garg has refused any discussions with the Receiver concerning these transfers unless the Receiver first "proves" his claims to Garg's attorneys.

The deposits, totaling $2,330,373.50, derived mainly from Sloan, although Sloan received nothing in return for making the payments. The contracts therefore should be property of the receivership estate under a constructive trust, but Garg refuses to turn over possession, insisting instead that the Receiver first "prove" his case to Garg's satisfaction.  The Receiver would prefer to avoid initiating costly litigation, but may have no other choice so long as Garg refuses to engage in any settlement discussions.[9]

- Prior to the Receiver's appointment, and apart from the money transferred in connection with the condominium presale agreements, Sloan transferred several million dollars directly to Garg, or to third parties on Garg's behalf.  Sloan received nothing in return; in fact, Garg directed that many of the expenditures, including expenditures for furnishings for his houses, be deducted as business expenses.[10]  Apart from their questionable tax treatment, Sloan's transfers to Garg likely would not have been problematic had Sloan generated the money legitimately.  However, Sloan obtained 50 percent,

---

[9] Among other things, Garg has argued that the receivership is to expire in January 2025 and that he will oppose any extension to preclude the Receiver from filing a lawsuit.

[10] The questionable business deductions appear on the 2022 federal tax returns, which were filed prior to the Receiver's appointment.  Garg now maintains that many of the same expenditures in 2023 should be determined to be taxable distributions to him; the Receiver, who is the sole person with authority to make that decision, *see* 26 U.S.C. §6012(b)(3), has not yet determined how to handle this issue.

or more, of its revenues by selling products it manufactured to the Receivership Entities KP Commerce, Pinnacle Payments, Legion Media, Black Window Group and Larchwood Distribution, all of which utilized an unlawful "negative option" business practice to defraud consumers of over $300 million.  The money Garg took from Sloan should be repaid, but Garg has refused any substantive discussion, claiming instead that he needs proof that he received transfers from Sloan.[11]

- Most troublingly, Garg and his ex-spouse, Patricia "Trish" Ohab, have conspired to compete with Sloan and F & B by stealing their customers.[12]  Specifically, in September 2024, while Ohab was still employed by Sloan, she reinstated a dissolved company she owned in Ontario, Canada called Toro Natural Labs, Ltd.  Ohab and Garg since have utilized Toro Natural Labs as a broker, or middleman, to attempt to shift business from at least one of Sloan's customers to a competitor affiliated with Garg, called Pharma Natural Health Solutions located in Miami.  Ohab's involvement with soliciting customers from

---

[11] Garg also maintains that his settlement with the FTC precludes the receivership estate from pursuing claims against him.  However, nothing in the Court's Stipulated Final Orders forecloses Sloan's claims against Garg for improper payments; such claims are independent of the FTC's claims for violations of consumer protection statutes and regulations.

[12] Ohab, who resides in Canada, was the Director of Purchasing for F & B and Sloan as of the Receiver's appointment.  Due to poor performance and an uncooperative attitude, the Receiver terminated her role with the company.  Ohab and Garg have hired lawyers in Toronto who are threatening litigation against Sloan for improper termination.

Sloan is a direct violation of her Non-Compete/Non-Disclosure Agreement. This conduct is causing damage to Sloan. The Receiver is contemplating litigation to enjoin this conduct.

IV.    RECEIVERSHIP POWERS

The Stipulated Final Orders clearly direct that the Receiver is to remain in place to accomplish certain tasks. To do this, the Receiver must have authority to proceed. Nothing in the Stipulated Final Orders provides that the Receiver's powers as expressed in the Court's TRO are changed, and there is no good reason they should be changed.

"[D]istrict courts have 'broad powers and wide discretion to determine relief in an equity receivership.' " *SEC v. Complete Business Solutions Group, Inc.*, 44 F.4th 1326, 1333 (11th Cir. 2022) (quoting *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992)). A receiver acts as an arm of the Court. *SEC v. Loving Spirit Found, Inc.*, 392 F.3d 486, 490 (D.C. Cir. 2004) ("Neither a plaintiff nor a defendant, the receiver functions as an arm of the court appointed to ensure that prevailing parties can and will obtain the relief it orders"). A receiver's authority therefore is defined by the order of the appointing court. *Id*. (quoting 13 James Wm. Moore et al., Moore's Federal Practice ¶ 66.04[1][b]). *See also SEC v. Davison,* 2023 WL 3995479 (M.D. Fla. May 16, 2023).

In its TRO, the Court granted to the Receiver customary powers, including without limitation authority (i) to enter the Receivership Entities' business premises, (ii) to remove management as necessary, (iii) to collect and open the Receivership Entities' mail, (iv) to open new bank accounts for the Receivership Entities, (v) to operate and manage the Receivership Entities' businesses so long as he determined they could be operated reasonably and profitably, (vi) to issue subpoenas and take depositions under expedited discovery provisions, (vii) to hire professionals, (viii) to seek compensation from the Court, (ix) to initiate litigation on behalf of Receivership Entities, and (x) to assert that claims against the Receivership Entities were stayed.  Each of the powers granted under the TRO is well within the broad discretion of the trial court, *SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992), and each was and remains essential for the Receiver to be able to complete his job.

As noted above, the Receiver is preparing Sloan, F & B and H & M for sale.  His objective is to obtain the best possible sales price for the companies or their assets for the benefit of the Receivership Estate.  Certainly, Garg cannot credibly argue that the Receiver cannot continue to enter into the companies' business premises, remove their management, open their mail, or do any of the other things specifically authorized under the TRO but not directly stated in the Stipulated Final Orders.  To function, and to accomplish

the court-ordered objectives, the Receiver needs the same powers as are set forth in the TRO.

Notably, neither Garg nor anyone else ever objected to the Receiver's powers conferred under the TRO, nor has there ever been any formal objection to the Receiver's continued use of them after the entry of the Stipulated Final Orders. The Receiver, for example, continues to enter the companies' business premises and manage their business affairs. He continues to operate the companies. He continues to review their mail. He continues to operate receivership bank accounts. He hired a professional (the management consultant discussed in Section II above) with the Court's approval. All of these actions since the entry of the Stipulated Final Orders derive from the powers expressed in the TRO.

The Court approved the Stipulated Final Orders in mid-September, 2024, approximately 90 days after the case was filed. In Section X of the orders, including the Stipulated Final Order pertaining to Garg, the Defendants expressly relinquished "dominion and all legal and equitable right, title, and interest in all assets in the Receivership Estate, and may not seek the return of any assets." According to Black's Law Dictionary, "assets" are "property of all kinds, real and personal, tangible and intangible, including . . . causes of action which belong to any person. . . ." Clearly included within the category of "assets" forfeited by Garg would be his interest in Sloan, F & B and

H & M, as well as claims the companies may hold against him and any other person. These assets have value that the Receiver is working to maximize and recover. Accordingly, the Receiver requests that the Court confirm that the powers conferred upon him in the TRO remain in place so that the Receiver can do his job.

V.    CONCLUSION

For the foregoing reasons, the Receiver requests entry of an order (i) extending the receivership for six months, subject to potential further extensions for good cause, and (ii) confirming that the powers granted to him under the TRO remain in place and available to the Receiver.

LOCAL RULE 3.01(g) CERTIFICATION

The Receiver certifies that prior to filing this motion he circulated a draft to all counsel in the case by e-mail and requested their position, in a good faith effort under Local Rule 3.01(g) to ascertain whether some or all of the relief requested herein would be opposed. The Receiver reports that, despite these efforts, not all parties agree to the relief requested. Specifically, Garg's attorneys advise by e-mail that they oppose the relief requested because, according to them, the motion "contains multiple misstatements of fact, and it fails to supply applicable law in support of the relief sought."[13] Garg offers no

---

[13] The Receiver submits that Garg's opposition as stated in his e-mail is not within the spirit of Local Rule 3.01(g) insofar as he fails to identify the alleged "multiple misstatements of fact" and does not address where "applicable law" is missing from the Receiver's draft motion.

substance in his e-mail beyond this statement, and so the Receiver is not able to address specific points that may trouble Garg.  All other parties advise that they do not oppose the motion.

/s/ Mark J. Bernet
Mark J. Bernet, Receiver
Florida Bar No. 606359
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
T:  (813) 223-7333
F:  (813) 223-2837
E-mail:  mark.bernet@akerman.com
Secondary:  caren.deruiter@akerman.com
Secondary:  sal.papsidero@akerman.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served by CM/ECF and via e-mail to Darren Lubetzky, Esquire, e-mail dlubetzky@ftc.gov, Vikram Jagadish, Esquire, e-mail vjagadish@ftc.gov, and via e-mail to Stephen R. Freeland, Esquire, sfreeland@grsm.com; Jim Felman, Esquire, **e-mail** JFelman@kmf-law.com; Michael Carey, Esquire, mcarey@careyomalley.com; Eric Forni, Esquire, e-mail Eric.forni@us.dlapiper.com; David Stier, Esquire, **e-mail** David.Stier@us.dlapiper.com and Eric S. Rosen, Esquire, e-mail erosen@dynamisllp.com, this 13th day of January, 2025.

/s/ Mark J. Bernet
Mark J. Bernet, Receiver

---

The Receiver therefore may choose to seek permission to file a Reply Brief under Local Rule 3.01(d) if Garg's opposition raises substantive arguments that he has not identified in his communications with the Receiver.

79534508;1