UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**FEDERAL TRADE COMMISSION,**

    Plaintiff,

                                    Case No. 8:24-cv-1459-JLB-AAS

**MANINDRA GARG, et al.,**

    **Defendants.**

_____/

DEFENDANT MANINDRA GARG'S RESPONSE
IN OPPOSITION TO RECEIVER'S MOTION TO EXTEND
RECEIVERSHIP AND CLARIFY RECEIVERSHIP AUTHORITY
AND RESPONSE TO RECEIVER'S SECOND INTERIM REPORT

Defendant Manindra Garg respectfully submits this response to the Receiver's Second Interim Report, Doc. 111, and Motion to Extend the Receivership and Confirm Receivership Authority ("Motion to Extend"), Doc. 114. These filings include numerous mischaracterizations and digressions that reflect the matters the Receiver has devoted his attention to instead of carrying out the most important of the tasks he was appointed to perform. The Receivership has been in place for over eight months without the Receiver making meaningful progress toward liquidating the Receivership estate's most valuable assets – legitimate, profitable companies. For these reasons and the reasons set forth in the following Memorandum, should the Court exercise its discretion to extend the Receivership, it should exercise its inherent authority over the Receiver to instruct him to focus on and wrap up the objectives he was appointed to accomplish.

1

## MEMORANDUM IN RESPONSE

### I. Background

#### A. Procedural history

On June 17, 2024, the Federal Trade Commission ("FTC" or "Plaintiff") filed its Complaint, Doc. 1, along with Plaintiff's *Ex Parte* Recommendation for a Temporary Receiver ("Temp. Receiver Rec."). The FTC proposed that the Court appoint Mark Bernet, Esquire, of the Akerman LLC law firm, as temporary receiver in this matter. Temp. Receiver Rec. at 1. With respect to the Defendants' businesses, the appointment of a temporary Receiver was requested to "monitor the use of Defendants' assets, identify and marshal assets, preserve records, determine the size and extent of Defendants' enterprise, [and] assess whether Defendants' businesses can operate lawfully and profitably." *Id.* at 2.

On June 18, 2024, the Court entered the Ex Parte Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("TRO"). The TRO appointed Mr. Bernet as temporary receiver over multiple entities, including Sloan Health Products ("Sloan"). Doc. 17. The Receivership was later expanded to include additional entities. *E.g.*, Doc. 25.

The FTC, Sloan, and Mr. Garg reached an agreement, and on September 16, 2024, the Court entered the Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief as to Mr. Garg and Sloan Health Products ("Permanent

2

Injunction"). Doc. 97. Accordingly, on September 16, 2024, the TRO expired upon entry of the Permanent Injunction.

On October 18, 2024, the Receiver filed his Notice of Expansion of Receivership seeking to expand the Receivership to include an additional entity, Shilin Investments, LLC. Doc. 105. Mr. Garg objected, Doc. 106, and the Notice of Expansion of Receivership was withdrawn, Doc. 109.

On January 2, 2025, the Receiver filed his Second Interim Report, Doc. 111, which included numerous misstatements and mischaracterizations about Mr. Garg, which are detailed below.

On January 13, 2025, the Receiver filed his Motion to Extend, Doc. 114, which requests that the Court extend the receivership for six more months, subject to potential further extensions, and confirm the powers granted to him under the TRO remain in place.

**B. The Garg Companies and the formation of the Receivership.**

Had the Plaintiff correctly understood the nature of Sloan and the other companies Mr. Garg owned (the "Garg Companies") at the outset of this case, it may not have sought a receiver for Sloan or requested that the Court include Sloan in the Receivership. At the time the FTC filed its Complaint, the FTC understood that Sloan's business premises consisted of an office in Tampa and a "warehouse" in Tennessee. Doc. 1 ¶12. In fact, Sloan and the other Garg Companies manufacture personal care products and provide related business services. Sloan was founded by

3

Mr. Garg in 2008 and had a lengthy, legitimate business history long before any involvement with the Legion Media Defendants or the activities alleged in the FTC's Complaint. Sloan's Tampa offices employed at least eight "back office" employees who handled the Garg Companies' business operations. The Tennessee facility is not a mere "warehouse," but a 110,000 square foot production facility with approximately 130 employees, in which extensive investments have been made in manufacturing equipment, as well as product research and development. *See generally* Doc. 87 at 8-11 & n. 11.

Along with the relatively recent business arrangement Sloan had supplying personal care products to the Legion Media Defendants, the company had a long history of supplying private label products that are sold at retailers such as Sephora. The FTC estimated that payments from the Legion Media Defendants represented only 34% of Sloan's revenues during the 2021 to 2024 time period, Doc. 4 at 4 n. 3, while the Receiver has estimated that the Legion Media Defendants represented approximately half of Sloan's 2023 sales, which had fallen to something over 35% of Sloan's 2024 sales. Doc. 87 at 8.

The Receiver has acknowledged that Sloan's sales to businesses other than the Legion Media Defendants are lawful and that the company was profitable without counting the sales to the Legion Media Defendants. Doc. 87 at 10. A related start-up company that Mr. Garg founded in 2023, F&B Cosmetics LLC ("F&B"), was also on its way to profitability when it was placed in the Receivership. *Id.* at 7-8, 10.

At the time the Receiver took possession of the Garg Companies, including their financial assets, Sloan's business bank accounts contained almost $6.2 million, and F&B's business bank accounts contained over $370,000. Other Garg Companies also had significant liquid and business assets that came under the control of the Receiver.

**C. Interactions with the Receiver**

On June 27, 2024, shortly after the initiation of the Receivership, Mr. Garg and his counsel, James E. Felman and Katherine Earle Yanes, met with the Receiver and his son (whom the Receiver appointed as his Deputy Receiver) in person at the Tampa offices of the Receiver's law firm and had what Mr. Garg and his counsel believed was a productive meeting. Not surprisingly, some prior Sloan customers were not interested in doing business with a company being run by a Receiver,[1] and Sloan lost business after the Receiver took over the company. Mr. Garg offered to assist the Receiver with addressing that and other issues that arose in operating the Garg Companies. As a result, the Receiver filed an unopposed motion to permit Mr. Garg to provide such assistance, Doc. 30, which was granted, Doc. 32. Despite requesting and obtaining permission for Mr. Garg to assist him, the Receiver has never sought Mr. Garg's assistance.[2]

Mr. Garg was able to engage in productive discussions with the FTC and settled with the FTC both individually and on behalf of Sloan. In contrast, once it became

---

[1] It is inherent in the nature of a Receivership that there is no future in the business relationship.
[2] The Receiver later hired a management consultant at a cost of $50,000 per month for 20 hours of work per week to assist in preparing Sloan, F&B, and other companies for sale. Doc. 103.

clear that Mr. Garg would not simply acquiesce to each of the Receiver's demands, the Receiver began to engage in a pattern of threats and disparagement toward Mr. Garg and incivility to Mr. Garg's counsel.[3]

The Receiver's approach has hindered efforts by Mr. Garg's counsel to interact with him. Despite the promising initial meeting Mr. Garg and his counsel had with the Receiver, it quickly became challenging for Mr. Garg's counsel to resolve even the most basic issues with the Receiver. The Receiver has repeatedly materially changed his positions, such that Mr. Garg and his counsel do not feel comfortable relying upon his representations. The Receiver seems to be more interested in belittling Mr. Garg and his counsel than discussing facts or legal theories. The Receiver's communications with Mr. Garg's counsel have frequently been discourteous. The Receiver has hung up on Mr. Garg's counsel more than once. On multiple occasions, the Receiver has refused to address or even copy Mr. Garg's counsel Mrs. Yanes on communications, even when responding to letters she sent him.

**D. The Receiver's Second Interim Report**

The Receiver's Second Interim Report illustrates the type of gratuitous disparagement of Mr. Garg that has characterized his dealings with Mr. Garg and Mr. Garg's counsel. For example, the Receiver complains in the Second Interim Report

---

[3] In the experience of Mr. Garg's counsel, members of the Bar of the Middle District of Florida nearly uniformly meet high standards of civility and professionalism. Counsel's experience with the Receiver in this matter has not been consistent with what they have come to expect from members of this Bar. This statement is not made lightly. Undersigned counsel has never previously to the best of her recollection raised in a court filing concerns about the lack of civility or professionalism of another attorney or party.

that "Garg 'loaned' the Lamborghini to a friend, who drove it from Tampa to California and then back," which the Receiver asserts caused damage to the car's paintwork, diminishing its value. Doc. 111 at 2 & n. 2, 11. The Receiver omits that the temporary transfer of possession of Mr. Garg's car was with the permission and agreement of both the Receiver and the FTC. After Mr. Garg's assets were frozen, Mr. Garg had no ability to make the car payments for his vehicles or maintain them, and the Receiver was unwilling to do so. Mr. Garg found a friend willing to make the payments on his car in exchange for having temporary possession of it until its disposition was determined. The Receiver agreed that this was an appropriate way to ensure that the car was paid for and maintained pending settlement and expressly approved this arrangement. After Mr. Garg settled with the FTC, the car was turned over to the Receiver, with the payments having been made and maintenance on it having been performed, at no cost to the Receivership estate. As to any purported damage to the car's paintwork, because the first time the Receiver inspected the car was when it was turned over to him post-settlement, he has no basis to make inferences regarding the timing of any such alleged damage. Further, when the car was turned over to the Receiver, its condition was documented, photographed, and videoed.[4]

The Receiver also discusses the sale of several luxury watches turned over by Mr. Garg and Mr. Topiwala. Doc. 111 at 3-4. The Receiver complains that the watches lost value because they showed wear and tear from having been worn –

---

[4] The video and photographic documentation of the car's condition at the time it was turned over to the Receiver is available to the Court upon request.

...

something the Receiver goes to the trouble of explaining that "true horologists" would not do – and because, according to the Receiver, the watchbands had to be resized because Mr. Garg and Mr. Topiwala "have small wrists." *Id.* at 4 & n.7.

The Receiver's comments regarding the sale of the cars and the watches appear to be aimed at justifying having failed to realize the full value of these assets. Because the Receiver does not separately describe the amounts received from each asset, it is impossible from his filing to determine exactly how much value was lost. The Receiver's comments about these matters are couched in terms that come across as more insulting than explanatory. It should go without saying that Mr. Garg should not be faulted either for wearing watches he owned or for the diameter of his wrist.

Also in the Second Interim Report, the Receiver accuses Mr. Garg of locking the Receiver out of the companies' American Express accounts. Doc. 111 at 11. Mr. Garg's counsel had explained to the Receiver, before he filed the Second Interim Report, that this representation was inaccurate. When the Garg Companies' American Express accounts were closed in November 2024, the Receiver jumped to the conclusion Mr. Garg's counsel had caused this to happen. The Receiver and Mr. Garg's counsel had extensive correspondence regarding this matter, copies of which are attached as composite Exhibit A (attachments consisting of statements for the business American Express accounts omitted). In summary, as the owner of the Garg Companies, Mr. Garg had opened American Express accounts for them on which Mr. Garg was the personal guarantor. During the initial in-person meeting of Mr. Garg,

his counsel, and the Receiver, the Receiver represented that the Receivership would pay for charges incurred in the course of operating the Receivership entities, and Mr. Garg took no steps to close the American Express accounts. In November 2024, American Express made a unilateral decision to cancel all of the business and personal accounts in Mr. Garg's name, which Mr. Garg only learned of when he was unable to access his personal American Express account and called American Express to inquire. At the time American Express closed Mr. Garg's accounts, all third parties Mr. Garg had granted privileges to regarding the accounts – including Sloan's CFO – also lost access to the accounts. In early December 2024, American Express contacted Mr. Garg about substantial overdue unpaid balances due on the company American Express accounts that the Receivership entities had continued to use. Mr. Garg explained to American Express that the business accounts were no longer his responsibility, he no longer had access to them, and he did not understand why they would be past due. American Express informed Mr. Garg that as the guarantor on the accounts, he would be held responsible for balances due on them. At that point – after American Express had already closed the accounts – American Express provided Mr. Garg with a temporary password to access the accounts online and obtain statements for the past due bills.

    Mr. Garg was not responsible for American Express closing the business American Express accounts and did not cause the Receivership to lose access to them. Although Mr. Garg's counsel repeatedly explained this to the Receiver, the Receiver

9

refused to pay the charges the company had incurred until threatened with litigation, to the detriment of the credit ratings of both Mr. Garg and the companies. *See generally* Ex. A.

The Receiver also asserts that Mr. Garg insisted that the Receivership make various mortgage and insurance payments related to real property Mr. Garg owns, promised he would surrender the properties to the Receivership, then reneged on his word. Doc. 111 at 12. This is false. When Mr. Garg's assets were frozen, he lacked the ability to make any payments related to these properties. It was agreed among all parties that the Receivership would make those payments to preserve the value of these assets while a settlement was being negotiated. This agreement was reached in lieu of Mr. Garg seeking Court authorization of funds so that he could make the payments himself. The settlement the Plaintiff ultimately negotiated with Mr. Garg required Mr. Garg to turn over title to substantial liquid assets to the Receivership, along with the valuable Garg Companies and the millions of dollars of liquid assets they held, and Mr. Garg was allowed to keep the real properties at issue. Doc. 91, Doc. 98. This agreement was effectuated with no opposition from the Receiver. Doc. 91. Mr. Garg was not required as a condition of the settlement or any agreement with the Receiver to repay the amounts the Receivership expended to ensure that the potential settlement assets retained their value.

Finally, the Receiver claims that Mr. Garg has improperly refused to turn over his interests in certain properties the Receiver contends should be part of the

Receivership estate because Sloan made payments toward them. Doc. 111 at 12-13. The Receiver overlooks that: (1) Sloan made payments toward these properties while Mr. Garg was the 100% owner of the company, and they are properly characterized as owner distributions; (2) payments toward the properties were also made by sources other than the Garg Companies; and (3) the parties agreed in the settlement that Mr. Garg would retain his interests in these properties. The Receiver's assertion that Mr. Garg has insisted that the Receiver "prove" his case, *id.* at 13, reflects requests by Mr. Garg's counsel that the Receiver provide a lawful basis for claiming entitlement to the properties in light of the above facts. The Receiver has yet to provide such a basis. Mr. Garg has not, as the Receiver suggests, *id.* at 13, "refuse[d] to engage in settlement discussions" with the Receiver, although it is accurate to say that attempts to communicate with the Receiver – regarding settlement or anything else – have been made difficult by the issues described above.

In total, the Receiver spends ten pages of the Second Interim Report describing the auction sale of Mr. Garg and Mr. Topiwala's cars and watches and attempting to justify the limited amount received at auction relative to the value of the items sold at auction, with complaints about and insults to Mr. Garg sprinkled in. Doc. 111 at 1-10. The Receiver then devotes an additional five pages of the Second Interim Report specifically to his complaints about Mr. Garg. *Id.* at 10-15. Other than making a passing reference – in the context of his inaccurate complaints about the American Express account – to Mr. Garg allegedly attempting to "frustrate the Receiver's

attempts to prepare the Receivership Entities Sloan Health Products, F&B Cosmetics and H&M Distribution for sale," the Receiver does not describe in the Second Interim Report the specifics of any efforts to sell those companies. As discussed below, the absence of any attention to such efforts is telling.

### E.  Receiver's Motion to Extend the Receivership

The Receiver seeks to extend the Receivership for, among other purposes: (1) selling Sloan, F&B, and H&M, and (2) initiating litigation the Receiver states he is "contemplating."[5]  Doc. 114 at 7-12, 14-18. Neither purpose justifies the lengthy extension the Receiver proposes, particularly in light of the lackadaisical approach the Receiver has taken so far accomplishing the goals for which he was appointed.

Of the purposes the Receiver was appointed for, Temp. Receiver Rec. at 2, the only remaining purpose to be fulfilled at this point is marshalling the assets of the Receivership estate. The Garg Companies are by far the most valuable assets in the Receivership. The Receiver was appointed in June 2024 – over seven months ago at the time of this filing. Yet, as the Second Interim Report makes clear, the Receiver's primary focus has been on matters other than selling the Garg Companies. Indeed, not only has the Receiver not yet listed the companies for sale, he has not even provided a plan for selling the companies, beyond stating a vague intention to place them "with a business broker or investment banker by the end of the first quarter of

---

[5] The Receiver also seeks additional time to liquidate certain sports memorabilia and finalize a settlement with credit card processor, Doc. 114 at 12-13, neither of which should require an extended time period to accomplish.

12

2025, with the goal of finding a buyer, and closing on a sale, by the end of the third quarter." Doc. 114 at 7-8. In other words, the Receiver's stated goal would leave the Receivership open for at least another 8½ months – over 15 months in total. While the Receiver has offered a variety of excuses for why he has not yet gotten the companies on the market, *id.* at 8-12, these are valuable companies the Receiver acknowledges can be operated "legally and profitably," *id.* at 7, and every month the Receivership remains open, the value of the estate is being diminished by the Receiver's fees and the $50,000 per month being spent on a part-time management consultant. With monthly costs of that magnitude, the law of diminishing returns suggests that it will not take long before additional time spent "preparing the companies for sale" will reduce the net value realized from such efforts. The Receiver should be directed to focus his efforts on selling the companies and wrapping up the Receivership.

  As to potential litigation, see Doc. 114 at 14-18, as discussed above, the Receiver has yet to provide Mr. Garg's counsel with any factual or legal support for any cause of action involving payments Sloan made on Mr. Garg's behalf while Mr. Garg was the 100% owner of the company.

  The Receiver's contention that he may sue Mr. Garg on the theory he has "conspired" with his ex-wife "to compete with Sloan and F&B by stealing their customers," Doc. 114 at 17-18, is similarly without foundation. Mr. Garg has returned to work, but he is not unlawfully competing with Sloan and F&B. In any event, Mr.

Garg is not subject to a non-compete as a result of either his former relationship with the companies he owned or the Settlement Agreement. The Receiver has no basis on which to claim Mr. Garg is barred from engaging in the lawful business that he has been involved in for decades.

For these reasons, litigation the Receiver suggests he is "contemplating" is also not a reason to extend the Receivership.

## II.  The Court should instruct the Receiver to accomplish his remaining efforts expeditiously and wrap up the Receivership.

The Receiver is acting under the authority of the Court and is subject to the Court's control. The Court has broad discretion to instruct the Receiver and manage the Receivership. If the Court determines that the Receivership should be extended, it should instruct the Receiver to expeditiously sell the remaining companies and wrap up the Receivership without delay.

A receiver is an "officer of the court" who is responsible for managing "property under the authority of the court." *In re San Vicente Med. Partners Ltd.*, 962 F.2d 1402, 1409 (9th Cir. 1992). The authority of a receiver "is wholly determined by the order of the appointing court." *Fed. Home Loan Mortg. Corp. v. Spark Tarrytown, Inc.*, 829 F. Supp. 82, 85 (S.D.N.Y. 1993) (quoting *Citibank, N.A. v. Nyland (CF 8) Ltd.*, 839 F.2d 93, 98 (2d Cir. 1988)). "Subsequent to the appointment of a receiver, "a court retains the equitable power to review the actions of the receiver and the propriety of continuing the receivership." *Id.*; *see also United States v. Wayne Cnty. Dept. of Health-Air Pollution Control Div.*, 571 F. Supp. 90, 92 (E.D. Mich. 1983) ("It is hornbook law that

14

the court which imposes a receivership retains jurisdiction and has supervisory control over those who administer it."). "[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *S.E.C. v. Torchia*, 922 F.3d 1307, 1316 (11th Cir. 2019) (quoting *S.E.C. v. Capital Consultants, LLC,* 397 F.3d 733, 738 (9th Cir. 2005)). "This discretion derives from the district court's inherent equitable powers." *Id.* A receivership should generally be terminated when the reason for the receivership ceases to exist. *See* 65 Am. Jur. 2d Receivers § 94 (citing *Jones v. Vill. of Proctorville, Ohio*, 290 F.2d 49 (6th Cir. 1961)).

Here, the Plaintiff's work to swiftly obtain significant settlements has ensured that there are substantial assets available for the benefit of any affected consumers. There is no benefit to be gained by needlessly dragging out the sale of the largest remaining Receivership asset – the Garg Companies. Instead, expeditiously liquidating them will maximize the net value received by the estate, as well as hasten consumers' recovery.

Rather than focusing his efforts on accomplishing the sale of the companies, however, the Receiver has been distracted by side quests and unnecessary interpersonal conflict. The difficulty of working with or communicating effectively with the Receiver has also slowed down the resolution of the matters the Receiver has been involved in.

Whether to extend the Receivership is a matter within the Court's extensive discretion, as is the manner in which the Receiver is permitted to operate as an officer of the Court. For all of the reasons described above, if the Court determines that it will extend the Receivership, the Court should exercise its authority to instruct the Receiver to focus his efforts on the sale of the remaining companies, accomplish that task without unnecessary delay, and expeditiously conclude the Receivership.

## CONCLUSION

For these reasons, if the Court determines that it will grant the Receiver's motion and extend the Receivership, the Court should instruct the Receiver to accomplish the sale of the remaining companies efficiently and expeditiously bring the Receivership to a conclusion.

Respectfully submitted,

/s/ Katherine Earle Yanes
James E. Felman
Florida Bar No. 0775568
Katherine Earle Yanes
Florida Bar No. 0159727
KYNES, MARKMAN & FELMAN, P.A.
Post Office Box 3396
Tampa, FL 33601
Phone: (813) 229-1118
Fax: (813) 221-6750
JFelman@kmf-law.com
KYanes@kmf-law.com
*Counsel for Defendant*
*Manindra Garg*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 27, 2025, I electronically filed the foregoing with the Clerk of the Court which will send a notice of electronic filing to all counsel of record.

*/s/ Katherine Earle Yanes*
Katherine Earle Yanes