UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

        Plaintiff,               Case no. 8:24-cv-1459-JLB-AAS

vs.

LEGION MEDIA, LLC, KP COMMERCE, LLC,
PINNACLE PAYMENTS, LLC, SLOAN HEALTH
PRODUCTS, LLC, HARSHIL TOPIWALA,
KIRTAN PATEL, and MANINDRA GARG,

        Defendants.

_____/

**RECEIVER'S THIRD INTERIM REPORT, CONCERNING**
**PREPARING THE SLOAN RECEIVERSHIP COMPANIES FOR SALE**

MARK J. BERNET (the "Receiver"), as receiver for Legion Media, LLC,

KP Commerce, LLC, Pinnacle Payments, LLC, Sloan Health Products, LLC,

Face and Body, LLC, F & B Cosmetics, LLC, H & M Distribution, LLC, HK

Distribution, LLC, Larchwood Distribution, LLC and Black Window Group,

LLC (collectively the "Receivership Entities"), files his third interim report. In

this report the Receiver will discuss his efforts to prepare three of the

Receivership Entities – Sloan Health Products, F & B Cosmetics and H & M

Distribution – to be sold as going concerns, the challenges faced, and the

Receiver's strategy going forward.

SUMMARY OF THIRD INTERIM REPORT

The Receiver opted to operate the Sloan Receivership Companies after his appointment because he determined that, with modifications to their business practices, they could be operated legally and profitably. The Receiver caused the companies to cease their participation in the "negative option" practices that were a significant issue in this litigation. The Receiver changed the companies' accounting practices so that they now follow generally accepted accounting principles. After a several month process, the companies have restated their financials for 2023 and prepared new financial statements for 2024. On a combined basis the Sloan Receivership Companies are generating a slight profit. The Receiver believes they will become more profitable over the next three to six months by continuing with the Receiver's turnaround plan. With an improved financial performance, the Receiver will realize a higher price when the companies are sold. The Receiver therefore believes it is prudent to delay marketing the companies for sale until at least after the end of the third quarter 2025.

MEMORANDUM

The Court has directed the Receiver to accomplish certain tasks, including selling the assets of the Receivership Estate. The assets include the three Sloan Receivership Companies (Sloan Health Products, F & B Cosmetics

and H & M Distribution), all of which are operating.  To maximize the Sloan

Receivership Companies' value, the Receiver has addressed operational,

accounting and corporate governance issues.  Presently, the companies are

marginally profitable on a combined basis, and likely will become more

profitable over the next several months as turnaround strategies take hold.

A.    PROCEDURAL BACKGROUND

On June 17, 2024, the Plaintiff filed this lawsuit, alleging that the

Defendants' businesses operated in violation of various provisions of federal

law, including:

- Section 5 of the FTC Act (prohibiting unfair or deceptive acts or practices in or affecting commerce);

- Sections 3 and 4 of the Restore Online Shoppers' Confidence Act (prohibiting merchants from charging consumers for goods or services sold in internet transactions through a "negative option" feature absent specific material disclosures and the consumers' express consent); and

- The Electronic Fund Transfer Act and associated Regulation E (prohibiting preauthorized transfers of funds from consumers' accounts without express written authorization).

On June 18, 2024, the Court entered its *Ex-Parte Temporary Restraining*

*Order and Order to Show Cause Why a Preliminary Injunction should not Issue*

(doc. no. 17) ("TRO") that, among other things, enjoined all of the Defendants

from any business activities that violated any of the federal laws and rules

mentioned above.  The TRO also appointed Mark J. Bernet as Temporary

Receiver to take control of the Company Defendants to examine their business

3

practices and suspend their business operations unless the Receiver determined they could be continued legally and profitably. TRO, Section XIV.T (p. 25).

The Receiver concluded that each of the non-parties Black Window Group, LLC, F & B Cosmetics, LLC, Face and Body, LLC, H & M Distribution, LLC, HK Distribution, LLC, and Larchwood Distribution, LLC (i) was involved with the sale or distribution of products with a Negative Option Feature, and (ii) was controlled or owned by one or more of the Defendants. In July 2024, and relying on Section XIV.U of the TRO (p. 25), the Receiver determined that each of those non-parties was a "Receivership Entity" and therefore under the Receiver's control. This determination has not been challenged.

The Receiver also concluded that the Sloan Receivership Companies, which employed approximately 130 people upon his appointment, could be changed to operate legally and profitably.[1] The Receiver therefore adjusted the companies' business practices and continued their business operations.

Under three separate orders imposing permanent injunctions, monetary judgments and other relief (doc nos. 97, 98 & 99) (collectively the "Settlement Orders"), each entered on September 16, 2024, the Court approved settlements

---

[1] Among other things, the Receiver suspended the Sloan Receivership Companies participation in business-to-consumer (B2C) sales because that portion of their business practices implicated the conduct that is the subject of the lawsuit. This reduced the revenues generated by the Sloan Receivership Companies by roughly 50 percent.

between the Plaintiff and the Defendants. The Court's Settlement Orders also continued the receivership and imposed duties upon the Receiver, including without limitation liquidating the assets of the Receivership Estate within 120 days of September 16, 2024 (subject to possible extensions).

By its February 14, 2025 Text Order (doc. no. 118), the Court granted the *Receiver's Motion to Extend Receivership and Confirm Receivership Authority* (doc. no. 114), and thereby extended the receivership through August 12, 2025 (subject to possible extensions). The Court also confirmed that the Receiver retained the same powers as had been granted under the TRO.

The TRO, as extended by the February 14, 2025 Text Order, directs the Receiver to:

> A.    Assume full control of all of the companies in receivership by removing, as the Receiver deems necessary or advisable, any director, officer, independent contractor, employee, or agent of the companies in receivership from control of, management of, or participation in, the affairs of the companies. On this basis, the Receiver has removed the Defendant Garg from management of the Sloan Receivership Companies.

> B.    Take exclusive custody, control and possession of all funds, property, premises, accounts, mail, and other assets and documents of, or in the possession, custody, or under the control of, the companies in receivership, wherever situated. On this basis the Receiver has assumed full control of the assets of the Sloan Receivership Companies.

> C.    Conserve, hold and manage all assets of the companies in receivership, and perform all acts necessary or advisable in my opinion to preserve the value of those assets. On this basis the Receiver has determined that he will sell the assets of the Sloan Receivership Companies, or sell the companies as going concerns.

*See* TRO, Section XV (beginning on p. 20).

The Receiver continues to operate the business-to-business (B2B) sales programs of the Sloan Receivership Companies and is contemplating returning to B2C sales (with safeguards and procedures to preclude recidivism, *see* fn. 1 *supra*).    The Receiver spent the past several months preparing the Sloan Receivership Companies to be sold.

> B.    THE SLOAN RECEIVERSHIP COMPANIES

The Receiver has worked diligently to prepare the Sloan Receivership Companies, or their assets, for sale.[2]

> 1.    F & B Cosmetics.  F & B Cosmetics manufactures skin and

hair care products.  It was created in late 2023 as a successor to Face and Body, LLC, although at the time Face and Body was in disarray because of ongoing, contentious litigation between its two owners, the Defendant Garg and Scott Knox.[3]  As of the Receiver's appointment F & B was essentially a start-up company, but its revenues since have increased exponentially, to the point where it is solidly profitable.

> 2.    H & M Distribution.  H & M Distribution is a fulfillment

company that "picks, packs and ships" products to customers.  It relied heavily

---

[2] The form of sale – a stock or asset sale – will be determined by the buyer.  The Receiver intends, however, to sell all three companies as a combined enterprise.

[3] The Receiver included Face and Body in the receivership principally so that he could control the litigation and resolve the disputes as they pertained to the Sloan Receivership Companies.  The Receiver was able to resolve Knox's claims against Face and Body and the Sloan Receivership Companies by paying Knox $5,000, in return for a general release.  The resolution did not address Knox's claims against Garg, or vice versa.

on the unlawful B2C business of the Legion Receivership Companies and suffered substantially reduced revenues when the Receiver shut those companies down. The Receiver, however, chose to continue to operate H & M because (i) it had infrastructure in place that would allow it to seek new customers for the lawful part of its fulfillment business, (ii) it had relatively low operating costs, and (iii) the Receiver believed it would make a nice "add-on" to potential purchasers of F & B and Sloan. H & M presently is operating at a small profit, with the potential to become more profitable.

3.   <u>Sloan Health Products</u>.   Sloan manufactures health supplements, including nootropics ("smart pills"), detox and cleansing capsules, male enhancement products, and weight loss products. Sloan generated more than 50 percent of its revenues from sales to the Legion Receivership Companies and, like H & M, suffered reduced sales when the Receiver shut those companies down. For the reasons discussed below, Sloan has been slow to regenerate its sales, although the Receiver is implementing strategies to hasten this.

C.   <u>CHALLENGES PREPARING THE COMPANIES TO BE SOLD</u>

The Receiver encountered accounting and operational issues in connection with preparing the Sloan Receivership Companies to be sold.

1.   <u>Accounting Records and Practices</u>.   The Receiver spent considerable time and effort revamping the companies' accounting policies and

7

restating their financials to conform to generally accepted accounting principles. This was necessary because potential purchasers will require accurate information concerning the companies' current and historic revenues and expenditures, and the financial records as of the Receiver's appointment were not accurate. With the assistance of the Receiver's management consultant and a new controller, the Sloan Receivership Companies revised their financial statements for the 2023 fiscal year and generated new financials for 2024.[4] The Receiver also may revise financial statements for prior to 2023.[5]

One common valuation method utilized by potential purchasers of companies is to ascertain the company's "Enterprise Value," which is calculated by multiplying the company's EBITDA (earnings before interest, taxes, depreciation and amortization) by an earnings multiplier. Generally speaking, the higher the EBITDA number, the higher the Enterprise Value, which in turn will generate a greater sale price. Computing an accurate number for EBITDA for the Sloan Receivership Companies required essentially re-stating significant portions of accounting entries made prior to

---

[4] The financial statements were completed in mid-March 2025.

[5] The Receiver is concerned that the Sloan Receivership Companies' tax returns for 2022 and prior years understated their taxable income by deducting expenses that should not have been deducted. The companies all are "pass-through" entities for tax purposes, and so taxable income will "pass through" directly to the owners (Garg for F & B and Sloan, Garg and Topiwala for H & M). The Receiver is preparing the 2023 and 2024 tax returns for the Sloan Receivership Companies. To keep the tax and accounting practices consistent as the companies are prepared for sale, the Receiver may choose to amend the earlier tax returns.

the Receiver's appointment to "normalize" earnings, because many items booked as expenses, such as Rolls Royces, Bentleys, condominiums, surgery centers, high-end watches, jewelry, disguised alimony payments (*see* fn. 15 below), furniture for personal use and $150,000 per month (or more) for travel and entertainment, were not legitimate business expenses.[6]  Restating the financials to conform to generally accepted accounting principles required an <u>enormous</u> effort from the Receiver and the staff of the Sloan Receivership Companies.

        The Receiver is confident that the revised financial statements accurately reflect the financial condition of the Sloan Receivership Companies.

        2.     <u>Operational Challenges</u>.  Also as part of his efforts to prepare the Sloan Receivership Companies to be sold, the Receiver addressed various operational and corporate governance matters.  Each of the three Sloan Receivership Companies operates out of the same 110,000 sq. ft. manufacturing facility located in Smyrna, Tennessee, but the factory is leased solely in the name of Sloan, and neither F & B nor H & M had any formal responsibility to contribute to the $100,000/month rent.  Equipment utilized by all three companies is owned by Sloan, but Sloan alone is liable on

---

[6] By claiming these items as "expenses," the owner of the company intended that the expenditures would not be treated as taxable distributions. *See* fn. 5 *supra.*  However, such expenses do not qualify as business deductions because they are not "ordinary and necessary" within the meaning of Section 162 of the Internal Revenue Code, 26 U.S.C. §162.

approximately $2.8 million in equipment loans. Similarly, the three companies share accounting and senior management staff, both in Tampa and Smyrna, with no formal agreement to allocate the expense. The Receiver addressed these and similar issues through a shared usage agreement that allocated expenses for the various items of overhead among the companies.[7]

The Receiver has taken steps to reduce expenses. Employee headcount has been reduced from approximately 130 as of the Receiver's appointment to approximately 95 as of March 31, 2025. Non-core assets – such as a gummy manufacturing machine that did not operate because it was made in China and could not obtain its UL certification – have been sold. Part of the Tampa corporate office has been subleased.

Employee retention also was a priority. The Receiver was able to retain most of the companies' senior management, but several administrative personnel left because of uncertainty over the companies being in receivership. The Receiver implemented two policies designed to address employee retention. First, the Receiver is paying quarterly bonuses of 2.5 percent of salary to the Sloan Receivership Companies' managers and middle managers. Second, the Receiver has agreed to set aside five percent of the gross realized on the sale of the companies for the employees. Both policies have proven to

---

[7] That the companies' assets and operations are intermingled makes it impractical to sell less than all three as a combined enterprise.

be popular, and the Receiver believes they have been key to retaining his key

senior management personnel and also in filling vacant positions.

As noted above, the revised financial statements for Sloan Health

Products were disappointing.  There are two primary reasons for this:

a)      <u>Sloan has not fully recovered from losing its sales to

the Legion Receivership Companies</u>.  Sloan manufactured and sold

health care supplements to the Legion Receivership Entities (including

KP Commerce, Pinnacle Payments, Larchwood Distribution and Black

Window Group), which in turn sold them in B2C e-commerce sales

utilizing unlawful "negative option" business practices.  The Receiver

shut down the Legion Receivership Entities, which eliminated Sloan's

largest customers.  This had the effect of reducing Sloan's revenues by

more than 50 percent.

b)      <u>Sloan does not yet have its NSF Certification</u>.  NSF

certification is a mark indicating a company complies with strict product

development standards and procedures, including extensive product

testing and material analyses, and that compliance is regularly tested

by an independent organization to ensure that it meets specific health

and safety standards. NSF International, formerly the National

Sanitation Foundation, is a trusted authority for public health and safety

standards, testing, certification, and consulting in various areas like

food, water, environmental safety and, as relevant here, health care supplements. Having an NSF certification enables manufacturers of health care supplements to sell their products to a much larger pool of potential customers. Amazon, for example, will not allow its merchants to sell health care supplements unless they are manufactured by a company with an NSF or similar certification.[8]

As matters stand, Sloan is not able to manufacture health care supplements in-house for its customers who require a manufacturer with an NSF certification. Instead, for some of those customers Sloan subcontracts the manufacturing to third-parties who hold the certification. While using third party manufacturers permits Sloan to fill orders, it also hurts Sloan's profit margin because Sloan must pay its third party manufacturer money that it otherwise could retain.

In mid-September 2024[9] the Receiver began investigating the possibility of obtaining an NSF certification for Sloan. The process

---

[8] Effective April 1, 2024, which was shortly before the Receiver's appointment, Amazon implemented a new policy requiring its merchants to certify dietary supplement products through a third-party testing, inspection, and certification (TIC) organization, such as NSF. With the new policy Amazon focused on safety and quality assurance by requiring testing data and certificates of analysis directly from the laboratories. F & B Cosmetics holds an NSF certification, and its products can be, and are, sold on the Amazon marketplace. Sloan, however, had not taken any steps to comply with this new Amazon policy as of the Receiver's appointment, and as a result its customer base was declining rapidly.

[9] The Court entered its Settlement Orders in September 2024. It was at that time that the Receiver was free to "manage" the Sloan Receivership Companies instead of acting as their "caretaker."

involves submitting an application to NSF and also preparing and submitting written documents identifying product specifications, manufacturing processes and compliance protocols. Products are sent for testing, and there also is an on-site inspection designed to determine whether the applicant's production facilities and processes align with NSF standards. The Receiver opted to proceed with seeking NSF certification for Sloan in early November 2024 and now believes that Sloan's NSF certification should be in hand by the end of June 2025.[10]

Sloan has several customers who stopped ordering supplements from Sloan, but who have indicated that they would resume placing orders when Sloan obtains its NSF certification. Sloan also will benefit from having the certification by being relieved of the necessity of subcontracting manufacturing activities to third parties. Additionally, Sloan has identified new, popular products that it will be able to manufacture when it obtains its certification.

---

[10] One challenge was that vendors whose services are needed to complete the NSF process were reluctant to work for Sloan due to unfamiliarity with the receivership process. The Receiver was able to satisfy the concerns of the necessary vendors.

D.    THE COMPANIES SHOULD DELAY THEIR SALE PROCESS
      UNTIL AFTER THE END OF THE THIRD QUARTER OF 2025

Section XV.D of the Court's TRO[11] directs the Receiver to conserve,

manage and prevent the loss of assets of the Receivership Estate, and to

"perform all acts necessary or advisable to preserve the value" of the assets of

the Receivership Estate.  The Sloan Receivership Companies presently have a

positive Enterprise Value, but as the Receiver's various turnaround strategies

take effect the EV will increase and thereby positively affect the companies'

sale price.  It therefore will be advantageous for all parties involved, as well as

injured consumers, to delay marketing the companies for sale for three to six

months.

Sloan in particular needs additional time to finish the process of

obtaining its NSF certification before going to market.  When it receives the

certification Sloan will be able to manufacture almost all nutraceuticals in-

house and thereby avoid the need to hire third party manufacturers.  This will

increase Sloan's profit margins by at least 20 percent.  Sloan has existing

nutraceutical customers who are waiting to provide purchase orders until

Sloan receives its NSF certification.  Sloan also is engaging new brokers to

assist with its sales, to begin after it obtains its NSF certification.  Accordingly,

---

[11] By its February 14, 2025 Text Order (doc. no. 118), the Court confirmed that the Receiver
retained the same powers as had been granted under the Court's TRO.

in the Receiver's business judgment it is advantageous for Sloan and the other Sloan Receivership Entities to delay going to market until after September 30, 2025.[12]

In making this determination the Receiver acknowledges that he previously anticipated beginning the marketing process in April 2025, and that a sale might be completed prior to the end of 2025. The 2024 financial statements, along with the restated 2023 financials, have caused the Receiver to reconsider his original thoughts on timing.[13]

E.    OTHER MATTERS

The Receiver remains actively involved in the Sloan Receivership Companies' day-to-day operations, spending on average five to six hours daily functioning as their CEO.[14]

Related to selling the Sloan Receivership Companies, the Receiver reports that he hired Mike Fixler and SC& H Capital as investment bankers to assist with marketing and closing on a sale. The Receiver will file a motion to approve their retention shortly.

---

[12] Again, all three of the Sloan Receivership Companies will need to be sold as a package. *See* fn. 7 and accompanying text, *supra*.

[13] The Receiver anticipates that he may be accused of "milking" the file by extending the sale process beyond what he originally anticipated. In response, the Receiver notes (i) his hourly rate for serving as receiver herein is less than half of his regular hourly rate charged to his other clients, and (ii) in his business judgment he is satisfied that delaying the sale of the companies to allow them to replace lost revenues, and develop new revenue streams, is in the best interest of the receivership estate.

[14] As noted in his fee applications, the Receiver generally bills only approximately 90 percent of his actual time spent.

Garg's former spouse, Patricia Ohab, was employed by Sloan and F & B as their purchasing manager as of the Receiver's appointment. Ohab is a Canadian citizen who was working from her home in Ontario. Sloan and F & B paid her $144,000 per year.[15] The salary was excessive for the job (by over 50 percent!), and Ohab's performance was lacking, prompting the Receiver to terminate her employment. Ohab then filed a lawsuit in Ontario charging Sloan with wrongful termination. Meanwhile, the Receiver discovered that while still employed by Sloan and F & B, Ohab set up a Canadian company that utilized proprietary information from Sloan and F & B to compete with them. Ohab and her Canadian company, Toro Natural Labs, have solicited existing customers of Sloan and F & B. Ohab's actions violate her non-disclosure and non-compete agreements. The Receiver has initiated a lawsuit against Ohab and her company in federal district court in Nashville, seeking in part to enjoin her conduct. Ohab was recently served with the lawsuit.

Since January 1, 2025, Sloan and F & B received surprise audit inspections from the United States Food and Drug Administration. The first inspection focused on F & B, while the second was concerned with Sloan. Sloan and F & B both passed their FDA audits with very high marks.

---

[15] The divorce decree between Garg and Ohab specified that Garg would pay Ohab $5,000 per month as alimony and keep her employed by Sloan. However, under the divorce degree if Sloan terminated Ohab's employment, then Garg's alimony obligation would increase to $10,000 per month.

The Receiver is continuing to work toward finalizing and filing the 2023 and 2024 federal tax returns for both Sloan and F & B, with the expectation of filing prior to the Memorial Day weekend.[16]

F.   CONCLUSION

The Receiver invites the questions and comments of the Court and the parties.

/s/ Mark J. Bernet
Mark J. Bernet, Receiver
Florida Bar No. 606359
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
T:  (813) 223-7333
F:  (813) 223-2837
E-mail:  mark.bernet@akerman.com
Secondary:  caren.deruiter@akerman.com

---

[16] H & M is owned 50-50 by Garg and Topiwala.  Topiwala caused H & M to file its 2023 return in March 2024, a few months prior to the Receiver's appointment.  Topiwala also caused the Legion Receivership Entities (Legion Media, KP Commerce, and Pinnacle Payments) to file their 2023 federal returns prior to the Receiver's appointment.  The Receiver is analyzing these returns to determine whether they will need to be amended.

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served by via e-mail to: Darren H. Lubetzky, Esquire, e-mail dlubetzky@ftc.gov; Karen Dahlberg O'Connell, Esquire, e-mail koconnell@ftc.gov; Vikram Jagadish, Esquire, e-mail vjagadish@ftc.gov; James E. Felman, Esquire, e-mail JFelman@kmf-law.com; Katherine E. Yanes, Esquire, e-mail KYanes@kmf-law.com; Janelly Crespo, Esquire, janelly.crespo@dlapiper.com; Michael R. Carey, Esquire, e-mail mcarey@careyomalley.com, amorgan@careyomalley.com; Eric Forni, Esquire, e-mail eric.forni@us.dlapiper.com; David Stier, Esquire, e-mail david.stier@us.dlapiper.com; Austin Brown, Esquire, e-mail austin.brown@dlapiper.com; Constantine Economides, Esquire, ceconomides@dynamisllp.com; Eric S. Rosen, Esquire, e-mail erosen@dynamisllp.com, Robert K. Tucker, II, Esquire, e-mail rtucker@grsm.com and mbperez@grsm.com; and Stephen R. Freeland, Esquire, e-mail sfreeland@grsm.com, this 13th day of May, 2025.

/s/ Mark J. Bernet
Mark J. Bernet, Receiver

81381277;1