UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

        Plaintiff,        Case no. 8:24-cv-1459-JLB-AAS

vs.

LEGION MEDIA, LLC, et al.,

        Defendants.
_____/

**RECEIVER'S VERIFIED THIRD APPLICATION FOR PAYMENT FOR SERVICES RENDERED AND COSTS INCURRED**

Mark J. Bernet (the "Receiver"), as receiver for Legion Media, LLC, KP Commerce, LLC, Pinnacle Payments, LLC, Sloan Health Products, LLC, Black Window Group, LLC, F & B Cosmetics, LLC, Face and Body, LLC, H & M Distribution, LLC, HK Distribution, LLC, and Larchwood Distribution, LLC, files his third application for payment for services rendered and reimbursement for costs incurred. As discussed in more detail below, the Receiver requests payment of $162,680 in fees, and reimbursement of $2,171.03 for expenses incurred, during the period from November 1, 2024, through and including February 28, 2025 (the "Third Interim Fee Period").[1]

**The Receiver reports that the relief requested herein is not opposed**

---

[1] Included in the expense request is $780.30 incurred during the Second Interim Fee Period. *See* Section IV below.

**by the Plaintiff or the Defendant Patel, and that the Defendants Topiwala and Garg take no position on the requested relief.**

The Receiver submits the following in support of his Third Interim Fee Application.

I. INTRODUCTION

    A. The Relief Requested

        1. By this Third Application the Receiver requests authority from this Court to pay himself $162,680 for his services rendered as receiver herein during the Third Interim Fee Period. The Receiver also requests authority to reimburse himself $2,171.03 for costs and expenses incurred. The expenses include $780.30 incurred during the Second Interim Fee Period (*see* Section IV below). The fees represent 392.0 hours expended by the Receiver over the Third Interim Fee Period at a proposed hourly rate of $415.00.[2] The Receiver has chosen <u>not</u> to seek reimbursement of 19.0 hours spent during the Third Interim Fee Period because he cannot at this time disclose the nature of the services rendered, although the Receiver reserves the opportunity to seek payment for the 19.0 hours in a subsequent fee application.

        2. The services rendered by the Receiver during the Third Interim Fee Period are discussed in greater detail in Section II below.

---

[2] The Receiver's proposed hourly rate represents more than a 50 percent discount off of his 2024 standard rate of $960.00/hour, and approximately a 60 percent discount off of his 2025 standard rate of $1,030/hour.

2

Additionally, the Receiver has filed an itemized description of his billable time expended on this case, together with a detailed billing log, recorded in tenths of an hour, for all tasks undertaken by the Receiver. *See* Exhibit "A." The Receiver has redacted the description of services rendered for 19 hours because those services relate to pending litigation matters; the Receiver accordingly does not seek compensation in this fee application for those 19 hours but intends to include them in a subsequent fee application.

        3.    All of the services for which the Receiver requests compensation were rendered solely in connection with this case and solely by the Receiver. All of the services that are the subject hereof were rendered during the Third Interim Fee Period.

        4.    The Receiver received no retainer for professional fees and costs in connection with his services herein. The Receiver has agreed to wait for a Court order authorizing payment before taking payment. This is the Receiver's third request for payment:

- By its *Order* dated December 3, 2024 (doc. no. 110), the Court awarded the Receiver $124,334 in fees incurred during the First Interim Fee Period, as well as expenses totaling $3,142.96.

- By its *Order* dated April 24, 2025 (doc. no. 127), the Court awarded the Receiver $145,333 in fees incurred during the Second Interim Fee Period.

3

5. The Receiver respectfully submits, in light of the difficult and complex nature of this case, that the requested compensation is fair and reasonable.

B. <u>The Background of the Case</u>.

The background of this case is set forth in the *Receiver's Third Interim Report, Concerning Preparing the Sloan Receivership Companies for Sale* (doc. no. 133), which is incorporated herein by this reference.

II. <u>ACTIVITIES DURING THE THIRD INTERIM FEE PERIOD</u>

During the Third Interim Fee Period the Receiver created a narrative record describing his activities in tenth-of-an-hour time increments. *See* Exhibit "A." Exhibit "A" was prepared by the Receiver in the ordinary course of business, as part of his regularly conducted business activities. The information contained in Exhibit "A" is based on the Receiver's personal knowledge. The Receiver included information on Exhibit "A" that occurred at or near the time of the events described. The records were maintained under the Receiver's personal custody and control.

Following is a discussion of some of the more significant tasks performed by the Receiver during the Third Interim Fee Period.

A. <u>Personal Property Auction</u>.

The Plaintiff and Defendants negotiated a final settlement during the Second Interim Fee Period, a laudatory accomplishment given the

complexity and size of the case. Under the settlement the Defendants were to surrender various assets to the Receiver, including cryptocurrency accounts, funds from brokerage accounts, and certain personal property to be liquidated.

The personal property transferred to the Receiver included Rolls Royce automobiles and various high-end watches. The Receiver concluded that these items should be sold at a public auction, and so during the Third Interim Fee Period the Receiver proceeded to prepare for, market and then conduct the auction. The specific details of the auction are discussed in the *Receiver's Second Interim Report, Concerning the Auction Sale and Disputes with Garg* (doc. no. 111), which is incorporated by this reference.

The Receiver conducted the auction on December 6, 2024. All persons who purchased an item needed to make payment within two business days. Most of the purchasers made payments timely, although the purchaser of one of the Rolls Royce automobiles did not. Instead of paying the price it bid at the auction, it tried to argue that the paper title to the vehicle was inadequate, and that it therefore would not pay unless the Receiver reduced the price. There was nothing wrong with the title. After several "robust" communications the purchaser paid the price it bid.

The Receiver netted slightly more than $1.8 million from the auction.

B.    Credit Card Reserves.

Pathward National Association provided merchant processing services to the Defendants. It was holding approximately $4.4 million of credit card reserves as of the commencement of this lawsuit. The Court's orders approving the parties' settlements directed Pathward to turn over the reserves to the Receiver, but Pathward is not a party and so asserted that it was not bound by the Court's orders under due process grounds. It further asserted that the reserves either were the property of Pathward, or alternatively that Pathward held a security interest in the reserves to secure the Defendants' obligations to Pathward arising under "chargeback" claims. The Receiver negotiated with Pathward and ultimately obtained Pathward's agreement to turn over $3 million. The agreement was documented and presented to the Court, *see Receiver's Unopposed Motion to Approve Settlement with Pathward, National Association Concerning the Turnover of Credit Card Reserves* (doc. no. 115). The Court granted that motion by its *Order* dated February 28, 2025 (doc. no. 120). Pathward paid the $3 million to the receivership estate.

C.    Tax Issues.

Under 26 U.S.C. §6012(b)(3), the Receiver must file all tax returns for the entities in receivership. In this case, the Legion Receivership Entities (Legion Media, Pinnacle Payments and KP Commerce), as well as H & M, filed their 2023 federal tax returns prior to the Receiver's appointment in June

6

2024. Two of the Sloan Receivership Entities (Sloan and F & B, both controlled by Garg) had not filed their federal tax returns. The Receiver therefore continued to assemble necessary financial records for his accountants to prepare and file the 2023 tax returns for Sloan and F & B. The Receiver also began working on the 2024 federal tax returns. The Receiver also analyzed whether the tax returns for the years prior to 2023 needed to be amended.[3]

While analyzing the tax records, the Receiver noted that the Sloan Receivership Entities never filed state income or sales tax returns, despite having transacted business in multiple states over the past several years. The Receiver suspects that the reason for this is that each of the Sloan Receivership Entities is a "pass-through" entity, such that tax liability would "pass through" the receivership entity to its owners (Garg for Sloan and F & B, Garg and Topiwala for H & M). The Receiver is responsible for filing state tax returns for 2024, and possibly for prior years as well. This is particularly important at

---

[3] For the 2022 tax year the Sloan Receivership Entities utilized a different methodology than the Receiver used to prepare the 2023 and 2024 federal tax returns. For example, in the 2023 tax return the Receiver opted to transfer assets that had been distributed to Garg off of the companies' balance sheets because the assets were not titled in the names of the companies. The 2022 tax return, however, included such assets on the companies' balance sheets, because by doing so the owners of the companies attempted to avoid recognizing taxable distributions. The pre-receivership tax methodology is not legally defensible. Garg's attorneys maintain that the Receiver is considering amending the tax returns solely to be vindictive because doing so likely would cause the owners of the companies to recognize taxable income for the years prior to the Receiver's appointment. The Receiver, however, is not concerned with the owners' individual tax liability, but rather is concerned that the improper methodologies utilized on the earlier returns could negatively impact the Receiver's efforts to sell the companies.

this time because potential buyers of the Sloan Receivership Entities will have concerns about the non-filed state tax returns.[4] During the Third Interim Fee Period the Receiver recorded time looking into this particular issue.

       D.    <u>Operational Issues</u>.

During the Third Interim Fee Period the Receiver continued to operate the Sloan Receivership Entities, with the plan that after implementing turnaround strategies, he could operate them "legally and profitably." He therefore continued their operations and functioned as their CEO. The Receiver handled various operational issues, including negotiating extensions for equipment loans, re-vamping the payroll system, handling personnel matters (including making necessary adjustments to employee headcount), product pricing, developing marketing plans and re-assuring customers who were unfamiliar with receiverships. Some of the more important "big picture" items included:

- <u>NSF Certification</u>. As reported in the *Receiver's Third Interim Report, Concerning Preparing the Sloan Receivership Companies for Sale* (doc. no. 133), the Receivership Entity Sloan Health Products did not have its NSF certification. Without it, Sloan cannot sell products on Amazon.com,

---

[4] Even though the Sloan Receivership Entities would not have tax liability in most states (again, as "pass-through" entities the liability would fall on the owners), it is possible that states could assert liens against the companies' assets. This would negatively impact the Receiver's sale efforts.

or to any third party who intends to re-sell the products on Amazon.com.[5] Obtaining the NSF certification therefore became a priority, and the Receiver recorded time during the Third Interim Fee Period working toward helping Sloan obtain the certification. Sloan's final inspection from NSF now is scheduled for the week of August 4, 2025.

- Accounting Records, Software Implementation. The Receiver's goal is to sell the Sloan Receivership Entities as going concerns; it therefore is incumbent that they be able to provide accurate financial information to potential purchasers. Unfortunately, the accounting records as of the Receiver's appointment were substandard. The Receiver and his management consultant continued to spend a considerable amount of time revamping the accounting systems and restating the financials for the 2023 calendar year to adopt generally accepted accounting principles. The Receiver also focused on creating useable financial reports for 2024, including monthly P & L statements, A/R reports, etc.

Additionally, prior to the Receiver's appointment Sloan purchased a sophisticated manufacturing batch software program developed

---

[5] Amazon's policy to require an NSF certification became effective April 1, 2024, approximately 2 ½ months prior to the Receiver's appointment. Sloan purposely decided that its primary customers, the Legion Receivership Entities, did not sell product on Amazon, thus rendering the NSF certification unnecessary. However, the Legion Receivership Entities employed unlawful sales practices, which required that the Receiver shut those companies down. This left Sloan with a very diminished customer base. The Receiver since has opted to focus efforts on developing sales to legitimate customers.

by Mar-Kov. The Mar-Kov software contains "feature-rich applications designed to support factory floor operations, specifically tailored to the vertical markets" it focuses on, which include cosmetics and pharma. Mar-Kov is designed to integrate with QuickBooks, Sloan's primary accounting software. Sloan had not implemented the Mar-Kov software program fully and was instead paying license fees while obtaining approximately half (or less) of the benefits it provides. The Receiver worked to implement the Mar-Kov system, and by the end of April it was 100 percent functional.

- <u>Equipment Loans</u>. The Sloan Receivership Entities are liable on equipment loans in favor of PNC Bank, some of which matured in September 2024. The Receiver spent time and effort working with PNC trying to obtain an extension, and also to find a takeout lender.

- <u>Marketing/Meetings with Customers</u>. While the Sloan Receivership Entities have sales and marketing personnel, the Receiver spent time during the Third Interim Fee Period meeting with various customers for sales and marketing purposes and to explain the receivership and sale process. The Receiver also worked on developing a marketing plan focusing on "legitimate" customers and sales practices, a marked departure from the Sloan Receivership Entities' pre-receivership marketing plan. *See* fn. 5 above.

- <u>Interviewing Investment Bankers</u>. To sell the companies, the Receiver determined that he would employ an investment

10

banker.  During the Third Interim Fee Period the Receiver interviewed multiple investment banking firms with the intention of selecting one.

The Receiver submits that functioning as the acting CEO of the Sloan Receivership Entities consumed an enormous amount of the Receiver's available time during the Third Interim Fee Period.

    E.    <u>Litigation</u>.

During the Second Interim Fee Period the Receiver initiated a lawsuit against Shilin Enterprises, LLC and 11th Street Condo Owner II, LLC, to recover money transferred by the Receivership Entities Sloan and Legion Media under condominium presale agreements.  Despite transferring over $1.5 million to the developer, neither Sloan nor Legion Media received anything in return; instead, the condominium presale agreement granted the right to purchase condominium units to Shilin.  During the Third Interim Fee Period the Receiver continued the litigation.

Garg's ex-spouse, Patricia "Trish" Ohab, was the Sloan Receivership Entities' purchasing manager as of the Receiver's appointment. She resided in Canada.  The Receiver terminated her employment.  She then filed a lawsuit against Sloan in Toronto, claiming improper termination. Meanwhile, the Receiver discovered that while still employed by the Sloan Receivership Entities she started her own business competing with the Sloan Receivership Entities in violation of her no-compete agreement.  The Receiver

therefore filed a lawsuit against Ohab in Nashville for damages and to enjoin her from violating her no-compete agreement.

      F.    <u>Reports</u>.

During the Third Interim Fee Period the Receiver prepared and filed his *Receiver's Second Interim Report, Concerning the Auction Sale and Disputes with Garg* (doc. no. 111), which discussed the auction sale of personal property and various other issues.[6]

      III.    <u>STANDARD FOR AWARDING COMPENSATION</u>

The Supreme Court has noted:

> Nor is there any doubt of the power of courts of equity to fix the compensation of their own receivers. That power results necessarily from the relation which the receiver sustains to the court; and, in the absence of any legislation regulating the receiver's salary or compensation, the matter is left entirely to the determination of the court from which [the receiver] derives his appointment. The compensation is usually determined according to the circumstances of the particular case and corresponds with the degree of responsibility and business ability required in the management of the affairs intrusted to [the receiver], and the perplexity and difficulty involved in that management.

*Stuart v. Boulware*, 133 U.S. 78, 81-82 (1890). To determine reasonable compensation for a receiver, a court should employ the familiar lodestar approach by calculating a reasonable hourly rate in the relevant market and a reasonable number of hours expended. *S.E.C. v. Aquacell Batteries, Inc.*, 2008

---

[6] The Defendants earlier complained that the Receiver did not identify the amounts received for each item of personal property sold at auction. A list is attached as Exhibit "B." Two of the items on the itemized list – Lots No. 118 & 119 – were from a different receivership estate.

WL 276026 (M.D. Fla. 2008). This figure then should be adjusted by examining the following factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and the ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974).[7]

   A. <u>The Time and Labor Required</u>. The time and labor required are reflected in the attached Exhibit "A." The activities during the Third Interim Fee Period demanded a very significant portion of the Receiver's time and attention. The Receiver recorded a total of 411.0 hours during the Third Interim Fee Period, but 19.0 of those hours (redacted on Exhibit "A") were for tasks that the Receiver chooses not to disclose presently because they relate to pending litigation matters. Instead, the Receiver seeks compensation for 392.0 hours in connection with the services he rendered during the Third Interim

---

[7] Decisions from the former Fifth Circuit Court of Appeals entered prior to September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981).

13

Fee Period and reserves the possibility of seeking reimbursement for the other 19.0 hours in a subsequent fee application. The Receiver generally recorded approximately 90 percent of his actual time to try to provide efficiencies to this case. The Receiver did not charge for travel time. The Receiver estimates that approximately 80 percent of the time he recorded during the Third Interim Fee Period pertained to the Sloan Receivership Entities, while the remaining 20 percent pertained to the Legion Receivership Entities.

      B.    <u>The Novelty and Difficulty of the Question</u>. Revamping the accounting systems of the Sloan Receivership Entities, locating and securing their records and assets, becoming involved (as the functional CEO) in the Sloan Receivership Entities' day-to-day operations, engaging in litigation activities, and continuing the process of preparing companies for sale as going concerns required the Receiver to draw upon all of his judgment, expertise and substantive legal and business knowledge.

      C.    <u>The Skill Necessary to Perform the Services Properly</u>. This case required the Receiver to draw upon all of his experience analyzing business, accounting, tax and legal matters. In essence, the Receiver functioned as the CEO for the Sloan Receivership Entities, where he addressed numerous strategic and operational issues on a daily basis.

      D.    <u>The Preclusion of Other Employment</u>. During the Third Interim Fee Period the Receiver devoted a <u>very</u> significant amount of his time

14

to this matter, and as a result he was unable to work on other matters wherein his clients had agreed to pay his regular hourly rate. Functioning as the Sloan Receivership Entities' CEO required almost all of the Receiver's time. At the end of the case the Receiver may ask the Court to increase the Receiver's hourly rate, in part relying on this factor.

    E. <u>The Customary Fee</u>.  The fees requested by the Receiver are those that are charged for similar services, except that, in this case the Receiver discounted his 2024 hourly rate by over $500 per hour, and his 2025 regular hourly rate by over $600 per hour. The Receiver also has generally recorded only 90 percent of the time he actually spent working on matters as receiver. The Receiver submits that, as an attorney, he provided the receivership estate with efficiencies that a non-attorney receiver would not be able to provide; in particular, the Receiver has handled most of the legal issues that have arisen (at his discounted hourly rate) himself.

    On the subject of the appropriate hourly rate, the Receiver notes that in the materials presented to the Court the Plaintiff accurately represented that the Receiver had agreed to accept the hourly rate of $415. If requested by the Court, the Receiver would introduce evidence to demonstrate that $415 per hour is below the market rate in Tampa, although the Receiver submits that the Court can make that determination based on its own knowledge. *See Proescher v. Sec. Collection Agency,* No. 3:17-CV-1052-J-

15

32PDB, 2018 WL 3432737, at *10-11 (M.D. Fla. June 8, 2018). The Court has already determined that the Receiver's $415 hourly rate is reasonable.

      F.    <u>Whether the Fee is Fixed or Contingent</u>. The fees requested are not contingent; however, they are subject to this Court's approval prior to being paid.

      G.    <u>Time Limitations Imposed by the Client</u>. In its Stipulated Final Judgments, the Court directed the Receiver to liquidate certain personal property assets within 60 days. The Receiver's efforts to schedule a public auction were complicated by two hurricanes during the fall of 2024 that left most suitable auction venues unavailable. Additionally, the Defendant Garg has continually pressured the Receiver to "hurry up and finish," likely to foreclose potential litigation claims against Garg. The Receiver is intent on selling the Sloan Receivership Entities as going concerns as quickly as possible, although he is not inclined to sacrifice "price" for "speed" as Garg demands.

      H.    <u>The Amount Involved and the Results Obtained</u>. The Receiver has collected in excess of $24 million and has good prospects for further recoveries. The money will be used to fund the receivership estates and for consumer redress now that the Plaintiff has obtained final judgments.

      I.    <u>The Experience, Reputation and Ability of the Receiver</u>. The Receiver is a 1986 graduate of the Notre Dame Law School, where he was a member of the Notre Dame Law Review. The Receiver holds an AV rating from

16

Martindale Hubbell, and he has received numerous receivership appointments in cases involving allegations of fraudulent misconduct and unlawful business practices, such as are involved this case, from courts in Florida, Georgia and Illinois. The Receiver has served as a receiver for more than 150 entities in approximately 25 lawsuits since 2003.

        J.    <u>The "Undesirability" of the Case</u>.  The case involved a very significant time commitment, but otherwise this factor need be given no extraordinary consideration.

        K.    <u>The Nature and Length of the Professional Relationship</u>. The Receiver reports to the Court, and accordingly there is no "professional relationship" within the usual meaning of the phrase. However, as noted above, the Receiver has regularly been appointed as receiver by this and other courts since 2003 for companies allegedly involved in fraudulent conduct.

        L.    <u>Awards in Similar Cases</u>.  It is customary for a court to award a receiver the fees he or she requests, particularly where the receiver has performed as directed and has requested a reasonable amount.

    IV.    <u>EXPENSES</u>

The Receiver also seeks reimbursement for expenses totaling $2,171.03, as itemized on Exhibit "A." This includes $780.30 incurred during the Second Interim Fee Period, which the Court did not approve in its ruling on the Receiver's Second Interim Fee Application due to the Receiver's failure to

include copies of receipts.[8] The expenses principally are for travel-related expenses. Copies of all relevant receipts are included as part of Exhibit "A."

## V. CONCLUSION

During the Third Interim Fee Period the Receiver recorded 411.0 hours of billable time but seeks compensation for only 392.0 hours, reserving the right to request compensation for the difference in a future fee application. At the agreed hourly rate of $415.00, this would result in fees of $162,680. Additionally, the Receiver seeks reimbursement of $2,171.03 for expenses, of which $780.30 accrued during the Second Interim Fee Period. No parties have objected to the entry of an order authorizing payment of these fees and expenses, and the Receiver accordingly requests entry of such an order.

---

[8] The Court's ruling did not identify whether its denial of the request for expenses accruing during the Second Interim Fee Period was with or without prejudice. If the Court intended to deny the request <u>with</u> prejudice, then this portion of the request herein should not be considered.

## LOCAL RULE 3.01(g) CERTIFICATION

The Receiver certifies that he conferred with all parties herein.  Counsel advises either that they do not object to the entry of an order awarding the fees and expenses set forth herein (Plaintiff and the Topiwala Defendants), or that they take no position (Patel and the Garg Defendants).

## VERIFICATION

The Receiver certifies that all factual statements contained herein are true and correct.

Dated:     Tampa, Florida
           August 6, 2025

                                      */s/ Mark J. Bernet*
                                      Mark J. Bernet, Receiver
                                      401 E. Jackson Street, Suite 1700
                                      Tampa, Florida  33602
                                      Telephone:  (813) 223-7333
                                      Facsimile:  (813) 218-5495
                                      Email:  mark.bernet@akerman.com
                                      Secondary:  caren.deruiter@akerman.com

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served by via e-mail to: Darren H. Lubetzky, Esquire, e-mail dlubetzky@ftc.gov; Vikram Jagadish, Esquire, e-mail vjagadish@ftc.gov; Stephen R. Freeland, Esquire, sfreeland@grsm.com; James E. Felman, Esquire, e-mail JFelman@kmf-law.com; Katherine E. Yanes, Esquire, e-mail KYanes@kmf-law.com; Janelly Crespo, Esquire, janelly.crespo@dklapiper.com; Austin K. Brown, Esquire, Austin.brown@dlapiper.com; Eric Forni, Esquire, e-mail eric.forni@us.dlapiper.com; David Stier, Esquire, e-mail david.stier@us.dlapiper.com; Constantine Economides, Esquire, ceconomides@dynamisllp.com; Eric S. Rosen, Esquire, e-mail erosen@dynamisllp.com, and Robert K. Tucker, II, Esquire, e-mail rtucker@grsm.com and mbperez@grsm.com this 6th day of August, 2025.

*/s/ Mark J. Bernet*
Mark J. Bernet, Receiver

82640758;1